******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# OHAN KARAGOZIAN *v.* USV OPTICAL, INC.
## (AC 40907)

DiPentima, C. J., and Lavine and Moll, Js.

*Syllabus*

The plaintiff, who had been employed by the defendant as a licensed optician manager of the optical department that it owned and operated in a department store, sought to recover damages for his alleged constructive discharge from his employment. In his complaint, the plaintiff alleged, inter alia, that from the beginning of his employment in June, 2014, to when he resigned in October, 2014, the defendant, acting through its supervisory personnel, required as part of his duties that he provide optometric assistant services to the doctor of optometry in the store, which violated certain public policies of the state, that he requested of the defendant's supervisory personnel that he not be required to perform the duties assigned to him, that following the defendant's refusal to excuse him, he was compelled to resign from his position and that the defendant thereby constructively discharged him in violation of the public policy of the state. The trial court granted the defendant's motion to strike the complaint on the ground that the complaint insufficiently alleged both elements of a claim of constructive discharge, finding that the allegations in no way could fairly be construed to establish that the defendant intentionally created an intolerable workplace or that there was an intolerable workplace that would have compelled a reasonable person to resign. Thereafter, the trial court granted the plaintiff's motion for judgment and rendered judgment in favor of the defendant. On the plaintiff's appeal to this court, *held* that the trial court properly granted the defendant's motion to strike the complaint and determined that the plaintiff failed to state a claim for constructive discharge: the plaintiff failed to allege in his complaint that the defendant intended to create a work environment so intolerable that a reasonable person would have been compelled to resign involuntarily, and the cases relied on by the plaintiff in support of his claim were inapplicable, as they had nothing to do with an employer's intent to create intolerable working conditions or to compel an employee to resign involuntarily; moreover, the plaintiff's attempt to bootstrap his claim by comparing his working conditions to those in *Sheets* v. *Teddy's Frost Foods, Inc.* (179 Conn. 471) and *Faulkner* v. *United Technologies Corp.* (240 Conn. 576) was unavailing, those cases having concerned wrongful retaliatory discharge claims, not constructive discharge, and the working environment in the subject store was not comparable to the ones confronted by the plaintiffs in either *Sheets* or *Faulkner*, as the plaintiff in the present case merely alleged that he was assigned duties that allegedly violated public policy and did not allege the consequences that may have befallen him by performing the duties to which he was assigned.

Argued October 11, 2018—officially released January 8, 2019

*Procedural History*

Action to recover damages for the plaintiff's alleged constructive discharge from employment, and for other relief, brought to the Superior Court in the judicial district of New Haven at Meriden, where the court, *Hon. John F. Cronan*, judge trial referee, granted the defendant's motion to strike the complaint; thereafter, the court, *Harmon, J.*, granted the plaintiff's motion for judgment and rendered judgment for the defendant, from which the plaintiff appealed to this court. *Affirmed.*

*John R. Williams*, for the appellant (plaintiff).

*Robert M. Palumbos*, pro hac vice, with whom was *Elizabeth M. Lacombe*, for the appellee (defendant).

*Scott Madeo* and *Brian Festa* filed a brief for the Commission on Human Rights and Opportunities as amicus curiae.

*Opinion*

LAVINE, J. The plaintiff, Ohan Karagozian, appeals from the judgment rendered by the trial court subsequent to its granting of the motion to strike the complaint filed by the defendant, USV Optical, Inc. The substance of the plaintiff's claim on appeal is that the court improperly concluded that he had failed to state a claim for constructive discharge.[1] We disagree and affirm the judgment of the trial court.

The record discloses the following procedural history. The plaintiff commenced the present action on September 12, 2016. The operative complaint for purposes of the present appeal is the corrected revised complaint (complaint) filed on December 19, 2016.

The complaint alleged, in relevant part, that the plaintiff is an optician licensed in Connecticut and that the defendant owns and operates optical departments in JCPenney stores. Between June and October, 2014, the defendant employed the plaintiff as a licensed optician manager in the JCPenney store in Trumbull (store). From approximately June 28 through October 17, 2104, the defendant, acting through its supervisory personnel, required the plaintiff, as part of his duties, to provide optometric assistant services to the doctor of optometry in the store. The complaint further alleged that the duties the plaintiff was required to perform violated the public policies of the state,[2] which prohibit employees under the control of unlicensed third parties from performing services for licensed optometrists,[3] and prohibit licensed opticians from performing the duties of an optometric assistant and providing services for optometrists by whom they are not employed.[4] The complaint also alleged that the duties the plaintiff was required to perform violated General Statutes § 31-130 (i),[5] which requires that the defendant or the store have a staffing permit allowing either of them to provide staffing services to a "doctor." On September 20 and October 3 and 16, 2014, and on other dates, the plaintiff requested of the defendant's supervisory personnel that he not be required to perform the duties assigned to him. The defendant refused to excuse the plaintiff as he requested. As a result, the complaint alleged that the plaintiff was compelled to resign from his position and to suffer the attendant loss of income. Lastly, the complaint alleged that the defendant constructively discharged the plaintiff in violation of the public policy of the state.

The defendant filed a motion to strike the complaint on the grounds that (1) there is no private right of action for the claim alleged and (2) the complaint failed to allege a claim of constructive discharge. In its memorandum of law in support of its motion to strike, the defendant addressed each of the bases for the plaintiff's claimed violations of public policy and explained why

none of them created a private right of action. The defendant argued that the only factual basis for the plaintiff's claim is the allegation that the defendant created an intolerable work environment by requiring him to provide optometric assistance services to the store doctor of optometry from the day his employment commenced. The defendant argued that it defies logic to claim that from the very first day of the plaintiff's employment the defendant intended to force him to resign.

The plaintiff opposed the motion to strike, arguing that "he was terminated because he declined to participate" in the duties he was required to perform and that such termination violated Connecticut public policy. He denied that the action was brought pursuant to § 31-130 (i) and the two administrative rulings; rather, he argued that the action sounds in the common-law exception to the at-will employment doctrine articulated in *Sheets* v. *Teddy's Frosted Foods*, *Inc.*, 179 Conn. 471, 427 A.2d 385 (1980). In *Sheets*, the employer *discharged the employee in retaliation* for the employee's objection to the employer's failure to comply with the requirements of Connecticut's Uniform Food, Drug and Cosmetic Act (act), General Statutes § 19-211 et seq. Id., 473. Our Supreme Court concluded that that plaintiff had stated a cause of action under the common law for *retaliatory wrongful discharge*. Id., 480. The plaintiff in the present case argued that *Sheets* "has since been applied to any termination in retaliation for refusing to violate laws or regulations or for insisting upon compliance therewith. See, e.g., *Faulkner* v. *United Technologies Corp.* 240 Conn. 576, 693 A.2d 293 (1997)."

The defendant responded to the plaintiff's opposition by noting, in part, that the plaintiff failed to allege a claim for wrongful termination or wrongful discharge. Although the plaintiff asserted in his opposition to the motion to strike that "he was terminated because he declined to participate in . . . activities and that such termination violated Connecticut public policy," the defendant correctly noted that the complaint specifically alleges that the "plaintiff was compelled to resign his position with the defendant." The defendant emphasized that it did not terminate the plaintiff's employment. The defendant also argued that the plaintiff misinterpreted the elements of a constructive discharge claim, noting that in *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 717 A.2d 1254 (1998), our Supreme Court stated that the "[c]onstuctive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily." (Emphasis in original; internal quotation marks omitted.) Id., 178, quoting *Chertkova* v. *Connecticut General Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996). It also pointed out that both *Sheets* and *Faulkner* were cases alleging wrongful termination of employment, not

constructive discharge.

The trial court heard oral argument on the defendant's motion to strike and issued a memorandum of decision on April 26, 2017, in which it granted the motion. The court relied on *Brittell* as the legal basis of its decision,[6] finding that the complaint insufficiently alleged both elements of constructive discharge. It bluntly stated that "[i]n no way" can the allegations fairly be construed to establish that the defendant *intentionally* created an intolerable workplace or that there was even an intolerable workplace that would compel a reasonable person to resign. The court concluded that although the complaint alleged constructive discharge in violation of public policy, the plaintiff had relied on cases dealing with wrongful termination of employment rather than constructive discharge. The plaintiff did not allege that he was wrongfully terminated in retaliation for refusing to participate in activities that violated the law. Cf. *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 480. The court, therefore, granted the motion to strike.

The plaintiff declined to replead and asked the court to render judgment in favor of the defendant. Following the entry of judgment, the plaintiff appealed. On appeal, the plaintiff claims that "[i]f an employer orders an employee to engage in illegal activity, and the employee resigns rather than break the law, the employee has been constructively discharged in violation of public policy and has a cause of action pursuant to the doctrine of *Sheets* . . . ."[7] Although the plaintiff acknowledges that *Sheets* is a wrongful termination case and that *Faulkner* is a wrongful retaliatory discharge case, he argues that in those cases, as in the present case, the employees were required to engage in illegal activity. He argues that whether an employer discharges an employee directly under the *Sheets* doctrine or constructively discharges the employee, the effect on the employee is the same and there cannot be any difference in the law's prohibition.

The defendant again contends in its appellate brief that the plaintiff failed to plead sufficient facts to support a claim for constructive discharge, noting that a plaintiff must allege that instead of firing an employee directly, the employer intentionally created "an intolerable work atmosphere that forces an employee to quit involuntarily." (Internal quotation marks omitted.) *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 178. It argues that one cannot infer from the allegations of the complaint that the defendant intended to create an intolerable work atmosphere when it hired the plaintiff to provide optometric assistant services to the doctor of optometry in the store. The defendant states once again that it is illogical to conclude that it intended from the first day of the plaintiff's employment to force him to quit involuntarily.[8] We agree with the defendant.

We briefly review the applicable legal principles and our standard of review. "The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted. . . . [S]ee Practice Book § 10-39. A motion to strike challenges the legal sufficiency of a pleading, and consequently, requires no factual findings by the trial court. . . . We take the facts to be those alleged in the complaint . . . and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Internal quotation marks omitted.) *Vazquez* v. *Buhl*, 150 Conn. App. 117, 125, 90 A.3d 331 (2014). Construction of a complaint is a question of law. *Edelman* v. *Page*, 123 Conn. App. 233, 243, 1 A.3d 1188, cert. denied, 299 Conn. 908, 10 A.3d 525 (2010). Our review of the court's ruling on a motion to strike is plenary. *U.S. Bank National Assn.* v. *Blowers*, 177 Conn. App. 622, 627, 172 A.3d 837 (2017), cert. granted on other grounds, 328 Conn. 904, 177 A.3d 1160 (2018).

"The constructive discharge concept originated in the labor-law field in the [1930s]; the National Labor Relations Board . . . developed the doctrine to address situations in which employers coerced employees to resign, often by creating intolerable working conditions, in retaliation for employees' engagement in collective activities. . . . Over the next two decades, Courts of Appeals sustained the [National Labor Relations Board's] constructive discharge rulings." (Citations omitted.) *Pennsylvania State Police* v. *Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).

In Connecticut, "[c]onstructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily. . . . Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. . . . *Brittell* v. *Dept. of Correction*, [supra, 247 Conn. 178]. A claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign. *Seery* v. *Yale-New Haven Hospital*, 17 Conn. App. 532, 540, 554 A.2d 757 (1989). Normally, an employee who resigns is not regarded as having been discharged, and thus would have no right of action for abusive discharge. . . . Through the use of constructive discharge, the law recognizes that an employee's voluntary resignation may be, in reality, a dismissal by the employer. . . . Id. Moreover, [i]n order to meet

the high standard applicable to a claim of constructive discharge, a plaintiff is required to show both (1) that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign. . . . *Irizarry* v. *Lily Transportation Corp.*, Docket No. 3:15-CV-1335 (DJS), 2017 WL 3037782, *4 (D. Conn. July 18, 2017), citing *Adams* v. *Festival Fun Parks, LLC*, 560 Fed. Appx. 47, 49 (2d Cir. 2014)." (Emphasis in original; internal quotation marks omitted.) *Horvath* v. *Hartford*, 178 Conn. App. 504, 510–11, 176 A.3d 592 (2017). Notably, a constructive discharge cause of action does not require that an employer violated a public policy.

On the basis of our plenary review of the allegations in the complaint, we conclude that the trial court properly determined that the plaintiff failed to state a claim for constructive discharge. There is no allegation in the complaint that reasonably can be construed to claim that the defendant *intended* to create conditions so intolerable that a reasonable person would be compelled to resign. See *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 178–79. The plaintiff denies the plain language of *Brittell*, arguing that a more sensible reading of *Brittell* would conclude that it is the employer's intent to create the work atmosphere in question that matters, rather than an intent that such atmosphere should force an employee to resign. He looks to federal cases to support his argument that, in cases applying the doctrine of constructive discharge, courts did not focus on the employer's state of mind, but on the objective reality of the working conditions and the impact of that objective reality, and not on the particular employee in question, but on the hypothetical reasonable person in the employee's position.[9] In his appellate brief, the plaintiff provides the following quote: " 'To find that an employee's resignation amounted to a constructive discharge, the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' *Whidbee* v. *Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) . . . ."[10] (Citation omitted.) See also *Pennsylvania State Police* v. *Suders*, supra, 542 U.S. 147.[11]

We acknowledge the federal standard as to the conditions that may compel an employee to resign involuntarily, which, as quoted, is no different from Connecticut's standard. The issues in the cases cited by the plaintiff, however, had nothing to do with an employer's intent, whether it related to the creation of intolerable working conditions or to compel an employee to resign involuntarily. In *Pennsylvania State Police*, the question concerned the burden of proof that

parties bear when a sexual harassment/constructive discharge claim is asserted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. *Pennsylvania State Police* v. *Suders*, supra, 542 U.S. 133.[12] That case, therefore, is inapplicable.

The trial court in the present case also concluded that the complaint failed to allege an intolerable workplace that would compel an objectively reasonable employee to resign. With respect to the workplace conditions in the store, the plaintiff attempts to bootstrap his claim by comparing his working conditions to those in *Sheets* v. *Teddy's Frost Foods, Inc.*, supra, 179 Conn. 471, and *Faulkner* v. *United Technologies Corp.*, supra, 240 Conn. 576. We reject his attempt. First of all, those cases concerned wrongful retaliatory discharge claims, not constructive discharge. Second, the circumstances under which the plaintiff alleged he was employed in the store are not comparable to those confronted by the plaintiffs in either *Sheets* or *Faulkner*. The plaintiff in the present case merely alleged that he was assigned duties that allegedly violated public policy.[13] Moreover, he did not allege the consequences that may have befallen him by performing the duties to which he was assigned. "A claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign." *Seery* v. *Yale-New Haven Hospital*, 17 Conn. App. 532, 540, 554 A.2d 757 (1989). Although *Sheets* and *Faulkner* are cases concerning wrongful retaliatory discharges, we examine them briefly to demonstrate the differences in workplace conditions.

The plaintiff in *Sheets* was employed as the quality control director and operations manager of Teddy's Frosted Foods, Inc., a producer of frozen food products. *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 473. During the course of his employment, the plaintiff noticed deviations from his employer's standards and labels, substandard vegetables, and underweight meat components. Id. Such deviations meant that the employer's products violated the express representations on its labels. Id. False or misleading labels violate the provisions of the act. Id. The plaintiff communicated his concern in writing to his employer and recommended more selective purchasing and conforming components. Id. His suggestions were ignored, and his employment was later terminated. Id. The plaintiff was discharged in retaliation for his efforts to ensure his employer's products complied with applicable law. Id. Our Supreme Court stated that the act imposes criminal penalties on anyone who violates it and that the criminal sanctions do not depend on proof of intent to defraud. Id., 478. The plaintiff's position as quality control director and operations manager may have exposed him to criminal prosecution under the act. Id. The court also found that the act was intended to safeguard public

health and to promote the public welfare by protecting the public from injury due to merchandising deceit. Id.

In *Faulkner*, our Supreme Court noted that in *Sheets* it stated that, "an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment." (Internal quotation marks omitted.) *Faulkner* v. *United Technologies Corp.*, supra, 240 Conn. 583. In *Faulkner*, our Supreme Court was called upon to determine whether the foregoing proposition applied to situations in which the source of criminal sanction was federal, rather than state, law.[14] Id. The court perceived no difference between *Sheets* and a situation in which an employee may be forced to engage in conduct that exposes the employee to federal criminal sanctions. The plaintiff in *Faulkner* alleged that his employer discharged him in violation of the public policy against government contract fraud. Id., 581. At the time, the Major Frauds Act, 18 U.S.C. § 1031, provided for the imposition of fines up to $10,000,000 and imprisonment up to ten years for a violation. Id. The plaintiff was a "supplier quality assurance representative." Id., 578. His job required him to inspect Blackhawk helicopter parts provided by various suppliers to ensure that they met the employer's engineering specifications. Id. On numerous occasions, he rejected defective parts despite pressure from the suppliers and his superiors to accept them. Id. He reported the existence of the defective parts to his superiors, who did nothing to correct the situation but informed the plaintiff that he might be disciplined for rejecting parts in the future. Id. The defendant employer subsequently discharged the plaintiff on the ground that he had engaged in misconduct. Id. In his complaint, the plaintiff alleged that he was discharged for refusing to accept substandard and defective helicopter parts. Id., 579. Our Supreme Court held that the plaintiff had stated a claim for wrongful discharge pursuant to the public policy limitation established in *Sheets*. Id., 589. In the present case, the plaintiff's work environment was not comparable to the one in either *Sheets* or *Faulkner*.

For the foregoing reasons, we conclude that the trial court properly granted the defendant's motion to strike. The plaintiff failed to allege that the defendant intended to create an intolerable work atmosphere that would compel a reasonable person to resign involuntarily.[15]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In his appellate brief, the plaintiff presented the following issue: "If an employee is ordered by his employer to engage in illegal activities and refuses to do so, and thereafter the employer on multiple occasions refuses to excuse [the employee] from the requirement of engaging in the said illegal activities, whereupon the employee resigns rather than violate the law, does the employer's conduct constitute constructive termination of employment in violation of public policy?"

The defendant contends that the issue presented by the plaintiff is a hypothetical one. We review the claim on the basis of the judgment from

which the plaintiff has appealed and the underlying procedural facts.

[2] The complaint alleged that the defendant required the plaintiff to perform the following duties: obtain and record a patient's preliminary case history; maintain records; schedule appointments, perform bookkeeping, correspondence and filing; prepare patients for vision examinations; assist in tests for near and far acuity, depth perception, macula integrity, color perception, and visual field, utilizing ocular testing apparatus; instruct patients in care and use of glasses and contact lenses; work with patients in vision therapy; assist patients in frame selection; adjust and repair glasses; modify contact lenses; maintain an inventory of materials and cleaning instruments; assist in fabrication of glasses and contact lenses; test and measure patients' acuity, peripheral vision, depth perception, focus, ocular movement and color as requested by the doctor; measure intraocular pressure of eyes using glaucoma test; measure axial length of eye, using ultrasound equipment; examine eyes for abnormalities of cornea and anterior or posterior chambers using slit lamp; apply drops to anesthetize, dilate or medicate eyes; instruct patients in eye care and use of glasses or contact lenses; adjust and repair glasses using screwdrivers and pliers; and take money from patients and record only those payments that are made with credit card and check on the store cash register inside the optical store while keeping tendered cash receipts from patients in an envelope under the cash drawer.

[3] The complaint alleged that the public policy is articulated in a declaratory ruling issued by the Connecticut Board of Examiners for Optometrists on May 1, 2002, titled *In re Petition of Lawrence Lefland, O.D.*, which was attached to the complaint as an exhibit. The plaintiff was not a party to the declaratory ruling, which concerns optometrists. The plaintiff alleged that he is a licensed optician.

[4] The complaint alleged that the public policy is articulated in a cease and desist consent order issued jointly by the Connecticut Board of Examiners for Optometrists and the Connecticut Board of Examiners for Opticians in February, 2006, in regard to petition number 2003-0321-003-003. The cease and desist order was attached to the complaint as an exhibit. The plaintiff was not a party to the cease and desist order.

[5] The complaint alleged that the relevant public policy is set forth in General Statutes § 31-130 (i), which provides: "No person shall engage in the business of procuring or offering to procure employees for persons seeking the services of employees or supplying employees to render services where a fee or other valuable thing is exacted, charged or received from the employer for procuring or assisting to procure or supplying such employees unless he registers with the Labor Commissioner. Application for such registration or for the annual renewal of such registration shall be on forms furnished by the commissioner and shall be accompanied by a fee of one hundred fifty dollars."

"[T]he policy behind General Statutes §§ 31-129 to 31-131c is to protect individual applicants (prospective employees) from unscrupulous employment agencies." *Monaco* v. *Turbomotive, Inc.*, 68 Conn. App. 61, 66, 789 A.2d 1099 (2002) (distinguishing between employment agencies that require employer, not employee, to pay fee); see also id., 66 n.2 (registration fee, not licensing fee, to prevent loss of state revenue). The defendant notes that the plaintiff did not allege that the defendant charged a fee.

[6] In *Brittell*, our Supreme Court was presented with a claim of sexual harassment in violation of General Statutes §§ 46a-60 (a) (1) and (8) and 46a-70. *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 161. In that case, our Supreme Court stated that it looks to federal case law in interpreting discrimination cases. Id., 164. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily. . . . Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. . . . Accordingly, [a] claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign." (Citations omitted; internal quotation marks omitted.) Id., 178. Our Supreme Court concluded that the plaintiff had failed to meet "her burden of establishing an essential element of her claim, namely, the existence of an intolerable work atmosphere that would compel a reasonable person in that situation to resign." Id., 179.

[7] The issue before our Supreme Court in *Sheets* was "whether to recognize an exception to the traditional rules governing employment at will so as to permit a cause of action for wrongful discharge where the discharge

contravenes a clear mandate of public policy." *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 474.

"In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary. Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability." (Internal quotation marks omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 697–98, 802 A.2d 731 (2002).

[8] In *Petrosino* v. *Bell Atlantic*, 385 F.3d 210, 231 (2d Cir. 2004), the United States Court of Appeals for the Second Circuit stated that the "law is clear that a constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with the work assignments she receives within her job title." See *Stetson* v. *NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir. 1993). *Petrosino* was cited frequently in the amicus curiae brief of the Commission on Human Rights and Opportunities with respect to the nature of an employer's intent in a constructive discharge case, but it did not address the quoted language. Neither the plaintiff nor the defendant addressed the law stated in *Stetson*, i.e., "constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments." Id.

[9] The plaintiff claims that this is an issue of first impression. He did not, however, raise this claim in the trial court when he opposed the defendant's motion to strike. The trial court, therefore, did not have an opportunity to address it.

[10] *Whidbee* concerned claims of a hostile work environment and constructive discharge brought pursuant to 42 U.S.C. § 1981 and New York law prohibiting inappropriate racial comments and tension created by one of the plaintiffs' coworkers. *Whidbee* v. *Garzarelli Food Specialties, Inc.*, supra, 223 F.3d 67. The Court of Appeals reversed the District Court's summary judgment in favor of the defendants on the plaintiffs' § 1981 claims regarding a hostile work environment but affirmed the summary judgment with respect to the constructive discharge claim against the defendants, concluding that there was no evidence that the defendants "*intentionally* create[d] an intolerable work atmosphere that force[d] an employee to quit involuntarily." (Emphasis added; internal quotation marks omitted.) Id., 74.

[11] A fuller reading of *Pennsylvania State Police*, a hostile work environment case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., discloses the following analysis. "The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment. For an atmosphere of sexual harassment or hostility to be actionable, we reiterate . . . the offending behavior must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . . A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. See, e.g., *Breeding* v. *Arthur Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) ([A]lthough there may be evidence from which a jury could find sexual harassment, . . . the fact alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit.); *Perry* v. *Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ([U]nless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress.)." (Citation omitted; internal quotation marks omitted.) *Pennsylvania State Police* v. *Suders*, supra, 542 U.S. 146–47.

[12] *Pennsylvania State Police* concerned "an employer's liability for one subset of Title VII constructive discharge claims: constructive discharge resulting from sexual harassment, or hostile work environment, attributable to a supervisor." (Internal quotation marks omitted.) *Pennsylvania State Police* v. *Suders*, supra, 542 U.S. 143. There are "two categories of hostile work environment claims: (1) harassment that culminates in a tangible employment action for which employers are strictly liable . . . and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense . . . ." (Citations omitted; internal quotation marks omitted.) Id.; see *Faragher* v. *Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1989) (when no tangible employment action taken, employer may raise affirmative defense to liability comprising two elements: employer exercised reasonable care to prevent and correct promptly sexual harassing behavior and employee unreasonably failed to take advantage of preventive or corrective opportunities provided

by employer or otherwise to avoid harm); *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1989) (same).

[13] We need not determine whether the duties the plaintiff was assigned violated public policy. But see footnotes 3, 4 and 5 of this opinion.

[14] In *Faulkner*, the defendant, United Technologies Corporation, claimed that the plaintiff could not state a cause of action pursuant to *Sheets* because his complaint was not grounded in a state law or public policy. See *Faulkner* v. *United Technologies Corp.*, supra, 240 Conn. 584.

[15] The Commission on Human Rights and Opportunities (commission) submitted an amicus curiae brief. In its brief, the commission asserted that it is responsible for investigating complaints that invoke the constructive discharge theory and has an interest in decisions that may affect its decision-making responsibilities. With respect to the present appeal, the commission claims that the decision of the trial court is unclear and subject to different interpretations. It, therefore, asks this court to address whether an employer's intent to create an intolerable work atmosphere is a necessary element of a constructive discharge claim. It argues that our Supreme Court attempted to resolve the role of an employer's intent in *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 148, but did so unsuccessfully when it stated "[c]onstructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily. . . . *Chertkova* v. *Connecticut General Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996); accord *Serry* v. *Yale New Haven Hospital*, [supra, 17 Conn. App. 540]." (Emphasis in original; internal quotation marks omitted.) *Brittell* v. *Dept. of Correction*, supra, 178.

The commission recognizes the plaintiff's argument that "a more sensible reading of *Brittell* would conclude that it is the intent to create the work atmosphere in question that matters, rather than an intent that such atmosphere should force an employee to resign." It acknowledges, however, that the most recent constructive discharge decision of this court is *Horvath* v. *Hartford*, supra, 178 Conn. App. 504, which adhered to the language in *Brittell*. Id., 510.

We decline the commission's request. As an intermediate court of appeal, we are "unable to overrule, reevaluate, or reexamine controlling precedent of our Supreme Court." (Internal quotation marks omitted.) *State* v. *Brantley*, 164 Conn. App. 459, 468, 138 A.3d 347, cert. denied, 321 Conn. 918, 136 A.3d 1276 (2016).