John C. STETSON, Plaintiff–Appellant,

v.

NYNEX SERVICE COMPANY and Nynex Corporation, Defendants–Appellees.

No. 1161, No. 92–9165.

United States Court of Appeals, Second Circuit.

Argued March 2, 1993.

Decided May 26, 1993.

David L. Sohn, Huntington, NY, for plaintiff-appellant.

Stuart H. Bompey, New York City (Jill L. Rosenberg, Orrick, Herrington & Sutcliffe, New York City, Bernard Yaker, White Plains, NY, on the brief), for defendants-appellees.

Before: KEARSE and WINTER, Circuit Judges, and CARMAN, Judge *.

KEARSE, Circuit Judge:

Plaintiff John C. Stetson appeals from a judgment of the United States District Court for the Southern District of New York, Charles S. Haight, Jr., *Judge,* dismissing his action against defendants NYNEX Service Company ("NSC") and NYNEX Corporation ("NYNEX") for an alleged constructive discharge in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

---

* Honorable Gregory W. Carman, of the United States Court of International Trade, sitting by designation.

§§ 621–634 (1988), and state law. The district court granted defendants' motion for summary judgment on the ground that the circumstances surrounding Stetson's alleged discharge were insufficient to warrant an inference of age discrimination. On appeal, Stetson contends that there were genuine issues of fact to be tried as to defendants' alleged discriminatory motive. For the reasons below, we agree with the district court that there was no proof of age discrimination, but we affirm principally on the ground that there was no proof of constructive discharge.

## I. BACKGROUND

NSC was a centralized support company owned by two NYNEX subsidiaries including New York Telephone ("Telco"). Stetson was employed by Telco for some 20 years beginning in 1966. In 1986, he went to work for NSC, where he remained until he formally elected to take early retirement effective in May 1990. The following description consists largely of facts admitted by Stetson in connection with defendants' motion for summary judgment.

In 1986, Stetson, then 53 years old, spoke to his contemporary and longtime friend Raymond Burke, who was NYNEX's Executive Vice President and General Counsel, about the availability of legal positions in NYNEX subsidiaries other than Telco. Burke arranged an interview for Stetson with Saul Fisher, Vice President, Secretary, and General Counsel of NSC, and Fisher hired Stetson as a "fourth-level attorney" to handle general legal issues. Prior to taking that position, Stetson was aware that Fisher had a reputation for being a "taskmaster," and that "nobody wanted to be a Service Company lawyer."

During 1986 and part of 1987, Stetson's performance with NSC was apparently satisfactory. For his 1986 performance, he received a $2,300 salary increase, raising his base salary to $93,000, plus a "Team Award" of $10,200, and an "Exceptional Merit Award" of $3,000.

In the summer of 1987, however, Fisher received complaints from attorneys at Telco with regard to the quality of certain contracts that Stetson had reviewed or prepared. The complaint was that important provisions were imprecise, ambiguous, and at times unintelligible; Fisher reviewed the contracts himself and agreed that some terms were not clearly defined and that key provisions were imprecise or poorly drafted. He assigned the legal work on these contracts to another attorney.

Stetson disputed these evaluations and thought the work should not be reassigned. He came to view this dispute as the start of the deterioration of his working relationship with Fisher. By the fall of 1987, Stetson had decided that he wanted to leave NSC and find employment at another NYNEX company. Fisher's review of Stetson's overall 1987 performance led him to grant Stetson a salary increase of $1,200 and a Team Award of $16,200, but no Exceptional Merit Award.

Stetson also received feedback from Fisher at weekly staff meetings, during which each of the attorneys would report on significant matters they were handling. Fisher would ask questions, make suggestions, and sometimes give critical feedback. All of the attenders were subject to this process and had their work critiqued from time to time. Stetson felt that in late 1988 into 1989, Fisher was unduly critical of Stetson's work.

In his semi-annual personnel review in October 1988, Stetson told Fisher he was unhappy with the work he was doing and wanted more substantial projects to supplement his day-to-day assignments. Thereafter, Fisher suggested that Stetson begin to attend the bi-weekly staff meetings of Mary McDermott. McDermott, hired as a fourth-level attorney in late 1987 and promoted to the fifth-level position of "general attorney" in 1988, handled regulatory and marketing work. Stetson attended her meetings but did not volunteer for any of her work.

In February 1989, Fisher reviewed Stetson's 1988 work performance and advised Stetson that his work was sloppy and not thorough. Fisher was also critical of Stetson's failure to keep him informed of work Stetson was performing. Fisher decided that Stetson would receive a Team Award of $15,400, but no increase in his base salary and no Exceptional Merit Award.

During the first seven months of 1989, Fisher assigned various projects to Stetson. Fisher viewed these projects as important; Stetson did not. From August 1989 until December 1989, nonmanagement employees of NYNEX engaged in a strike; most management-level employees, including Stetson, had special strike-duty assignments that took them out of their usual offices. Stetson had an assignment on Long Island, and during that time he had little or no contact with Fisher. From December 1989 until his annual performance review in March 1990, Stetson did not ask either Fisher or McDermott for any assignments.

In late December 1989, NYNEX announced to the employees in its various companies a voluntary Special Retirement Incentive ("SRI") program for management-level employees who were eligible for pensions. Approximately 11,000 employees were eligible to participate in the program, which would enable them to retire voluntarily between January 1 and May 31, 1990, with enhanced pension benefits.

On January 12, 1990, Stetson went to see Burke, stating that he was unhappy with Fisher and seeking Burke's advice and assistance. Stetson expected that because Burke was a friend he would get Stetson another job in a NYNEX company. In March 1989, however, NYNEX had established a formal transfer process for filling attorney vacancies in the legal departments of its various units. At this January 1990 meeting, Burke refused to get Stetson a new job. Burke said Stetson had three options: continue to work at NSC, use the formal transfer process to seek a job in another NYNEX unit, or apply for early retirement under the SRI. According to Stetson, Burke said, "Don't you feel like you have slowed down? I know I have."

Other than the January 12, 1990 discussion, Stetson never discussed retirement with Burke. Nor did Stetson at any time discuss the issue of retirement or the SRI with Fisher. At no time during Stetson's employment did Fisher ever threaten, either expressly or impliedly, that Stetson's employment would be terminated. On March 21, 1990, Stetson submitted his application for early retirement under the SRI.

At his 1990 annual review, which defendants place on March 22 but Stetson says occurred earlier, Fisher criticized Stetson's work on a number of projects and informed Stetson that he would receive no increase in his base salary. However, in view of Stetson's strike-duty performance, he awarded Stetson a Team Award of $12,900 and an Exceptional Merit Award of $2,000. During this meeting, Stetson told Fisher he was unhappy with the type of work he was doing and thought he could not do anything to please Fisher. Fisher told Stetson to report instead to McDermott, with whom Stetson had never had any problems. This did not entail any reduction of Stetson's salary or grade level.

During this meeting, Stetson did not disclose his intention to take early retirement within a few months. After Fisher learned of Stetson's March 21 application, he sent Stetson a letter dated May 24, 1990, inviting Stetson to rescind his retirement decision and remain with NSC. Burke, by letter dated May 21, had likewise advised Stetson that he was free to remain employed by NSC. Stetson informed Fisher that he was not interested. He retired effective May 31.

In August 1990, Stetson commenced the present action, alleging that his early retirement decision was not voluntary but rather was a response to intolerable working conditions. He asserted that NYNEX and NSC executives had been pressured to force employees to participate in the early retirement plan, and that Fisher and Burke imposed the intolerable working conditions on him solely because of his age and with the intent of forcing him to retire. He alleged that his retirement was thus the result of a constructive discharge in violation of the ADEA and New York's Human Rights Law ("HRL"), N.Y.Exec.Law §§ 290–301 (McKinney 1993).

After more than a year of discovery, defendants moved for summary judgment on the grounds that there was no evidence of a discharge and no evidence of any age-discriminatory ingredient in their treatment of Stetson. In connection with this motion, Stetson conceded that though he was aware that NSC had an internal complaint proce-

dure to deal with charges of discrimination, he had never used that procedure. And though he asserted that he had been embarrassed, demeaned, humiliated, and made anxious as a result of defendants' alleged conduct, he did not seek any medical, psychiatric, or psychological treatment for those conditions.

In a Memorandum Opinion and Order dated September 29, 1992, 1992 WL 276574, ("District Court Opinion"), the district court granted the motion only on the ground of lack of evidence of age discrimination. Though the court noted that "[n]owhere does plaintiff allege that he was threatened with termination if he did not accept early retirement, or that there would be any retaliation if he did not accept early retirement," District Court Opinion at 11, it declined to conclude that there had been no constructive discharge as a matter of law, stating as follows:

> Defendants' brief analyzes each of plaintiff's contentions regarding the factors which made his working conditions intolerable (e.g., mundane work, lack of salary increase, criticism from supervisor, alleged demotion). For each aspect cited by the plaintiff, defendants provide ample support for the proposition that it is insufficient as a matter of law to constitute constructive discharge.... This Court entertains serious doubts whether any one of these conditions, as described by the plaintiff, would be sufficient to support a claim of constructive discharge.
>
> However, for the purposes of this motion, this Court is not willing to say that the *combined* effect of these factors is insufficient, as a matter of law, to establish constructive discharge. A reasonable jury could find that the cumulative effect of the conditions alleged by plaintiff created a working environment so intolerable that a reasonable person might be forced to resign from his job.

*Id.* at 7–8 (emphasis in original).

The court concluded, however, that there was no evidence of age-based discriminatory animus. The sole mention to Stetson of the early retirement plan came from Burke, whom Stetson had consulted as a friend and who outlined several options open to Stetson, including remaining with NSC. The court found that that "single mention of the existence of the retirement option [wa]s insufficient as a matter of law to establish ageist animus." *Id.* at 11. Though Stetson claimed that NYNEX and NSC supervisors had been pressured to force employees to participate in the early retirement plan and that this pressure was "general[ly] known," the court found that there was no evidence to support Stetson's assertion that such pressure existed. The court also noted that

> nothing in the record suggests that plaintiff's working conditions (e.g., criticisms from Fisher, type of work he was assigned), were very different from 1987 until 1989, than they were from 1989 until 1990, when the defendants allegedly knew about the early retirement plan.

*Id.* at 12. The court observed that "it is quite clear from the record that plaintiff's difficulties with his superiors commenced long before 1989, and that as early as 1987, he was seeking to leave NSC." *Id.* at 11.

Judgment was entered dismissing the complaint. This appeal followed.

## II. DISCUSSION

On appeal, Stetson contends principally that the district court erred in ruling that there was insufficient proof to require a trial on the issue of whether his discharge was motivated by age discrimination. Though we agree with the district court, substantially for the reasons set forth in its opinion, that Stetson failed to adduce sufficient evidence to require a trial as to the alleged age-discriminatory motivation, we affirm principally because there was no proof of a constructive discharge.

In order to establish a prima facie case of termination of employment in violation of the ADEA, a plaintiff must show (1) that he was within the protected age group, (2) that he was qualified for the job, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination. *See, e.g., Hollander v. American Cyanamid Co.,* 895 F.2d 80, 83 (2d Cir.1990); *Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir.1983).

A "discharge," in satisfaction of the third element of the prima facie case, may be either an actual termination of the plaintiff's employment by the employer or a "constructive" discharge. *See, e.g., id.* at 325; *see also Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987); *Martin v. Citibank, N.A.,* 762 F.2d 212, 221 (2d Cir.1985). Stetson's state-law HRL claim is governed by the same standards as his federal claim. *See, e.g., Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

■ To establish a "constructive discharge," a plaintiff must show that the employer " 'deliberately ma[de his] working conditions so intolerable that [he was] forced into an involuntary resignation.' " *Pena v. Brattleboro Retreat,* 702 F.2d at 325 (quoting *Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975)). For example, in *Lopez v. S.B. Thomas, Inc.,* we reversed the granting of summary judgment dismissing a claim by Lopez, an employee of Puerto Rican descent, for constructive discharge in violation of 42 U.S.C. § 1981 (1982). According to Lopez, his supervisor had criticized his performance in ethnically degrading, lewd, and obscene terms. When Lopez complained to the defendant's vice president, the vice president suggested that Lopez resign. In addition, a few months later, the supervisor placed Lopez on 90 days' probation and told him that at the end of that period his employment would be terminated regardless of his performance. Ten days later, Lopez resigned. We ruled that these facts, if proven, would suffice to permit a reasonable factfinder to find that Lopez had been constructively discharged. *See* 831 F.2d at 1186–88.

■ A constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments. In *Pena v. Brattleboro Retreat,* for example, Pena, a nursing home administrator nearing the age of her planned retirement, was asked to delegate supervisory authority to her planned successor a year earlier than Pena desired. Unwilling to accept the employer's decision that she should concentrate on deal-ing with government regulatory matters and transfer to the successor responsibility for supervision of day-to-day operations immediately, Pena resigned. She sued under the ADEA claiming a constructive discharge. We noted that it was undisputed that the nursing home employer wanted Pena to remain in its employ, and that she was faced with no loss of pay or change in title. Reviewing a jury verdict in favor of Pena, we concluded that the defendant was entitled to judgment notwithstanding the verdict because these facts were insufficient to permit a rational jury to find a constructive discharge. *See* 702 F.2d at 325–26.

Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized. *See, e.g., Clowes v. Allegheny Valley Hospital,* 991 F.2d 1159, 1160–61 (3d Cir.1993). In *Clowes,* the gist of the 53–year–old plaintiff's ADEA claim was that her 34–year–old supervisor had forced her to resign by engaging in unduly close monitoring of the plaintiff's work and by being unduly critical of that work. Reviewing a verdict in the plaintiff's favor, the Third Circuit noted, *inter alia,* that the employer had not threatened the plaintiff with discharge or suggested that she resign or retire; it had not demoted her or changed her job responsibilities; it had not reduced her pay or benefits. The court concluded that the evidence of hypercritical supervision fell well short of permitting an inference of constructive discharge, noting that even "unfair and unwarranted treatment is by no means the same as constructive discharge." *Id.* at 1162.

Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant. In *Martin v. Citibank, N.A.,* 762 F.2d 212, for example, we considered a claim of constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1982), after which the ADEA was patterned, and 42 U.S.C. § 1981, based on allegations that the plaintiff, a Black employee of the defendant bank, had resigned because of intolerable working conditions consisting of her supervisor's unnecessary announcement to coworkers that the plaintiff had been polygraphed with respect

to missing money at another branch of the bank, unfounded complaints as to the plaintiff's attitude, and other conduct by the supervisor and others that interfered with the plaintiff's ability to perform her duties. We held that the district court properly ruled as a matter of law that these circumstances did not amount to a constructive discharge. *See* 762 F.2d at 221.

■ In sum, a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were " 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Pena v. Brattleboro Retreat*, 702 F.2d at 325 (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)).

■ In the present case, though Stetson was dissatisfied with his assignments, with the criticisms of his work, and apparently with his compensation, the record falls far short of reflecting working conditions so difficult or unpleasant as to permit an inference that a reasonable person in Stetson's position would believe he was forced to resign. Fisher had indeed lived up to his advance reputation as a tough taskmaster; he received complaints about Stetson's work, reviewed that work, and was critical of it; he was also critical of other work done by Stetson. The nature of Stetson's assignments and the criticisms of the quality of his work caused Stetson to become dissatisfied with NSC barely a year after he was employed there, and he decided in 1987 that he wanted to leave. Yet Stetson did not feel compelled to resign in 1987; given the record, he could not reasonably have felt at that time that he had no alternative but to resign; and the record does not show any change in Stetson's working conditions thereafter that could have caused a reasonable person in his position to conclude that he was forced to resign in 1990. After 1987, Fisher had continued to give Stetson assignments; in response to Stetson's complaints that his assignments were mundane, Fisher had Stetson attend meetings of a group dealing with other types of matters. Fisher never reduced Stetson's rank or salary; rather, he granted Stetson a raise, or a team bonus, or an individual merit bonus, or some combination thereof, for every year that Stetson was employed by NSC, with variations in the awards tied to Stetson's work performance.

Fisher never mentioned retirement to Stetson and never either expressly or impliedly suggested that Stetson's employment would be terminated. When Stetson sought out his old friend Burke for help in getting a new NYNEX job, Burke told him that one of his options, along with the options of early retirement and finding his own new NYNEX position, was to stay with NSC. Though early retirement with special benefits became available in 1990 through the SRI plan, there was no evidence that that plan was other than entirely voluntary or that executives of NYNEX or NSC were under pressure to force eligible employees to take early retirement. When Stetson eventually opted for early retirement, both Burke and Fisher urged him to stay with NSC.

Thus, the undisputed facts show that Stetson's working conditions were essentially the same from late 1987 until he applied for early retirement in 1990. Stetson does not even remotely suggest that he was constructively discharged prior to 1990. Instead, he argues that Burke's 1990 refusal to find him a new job within NYNEX, suggesting that he remain employed by NSC, constituted a constructive discharge from NSC:

> What else is it but a threat of termination . . . when Burke refuses to help Stetson get away from Fisher, telling him that he will have to stay put? When Burke's refusal to assist Stetson was coupled with suggestions of early retirement couched in references to Stetson's age and relative state of decrepitude, Stetson received, as would any reasonable man under the same circumstances, a very strong message. All three options that Burke gave to Stetson, *viz.*, stay where he was, try on his own to transfer within the system, or retire and get another job, [ ]were elements of the *constructive* termination. For Burke to compel Stetson to remain with Fisher, when it could have been prevented, or suffer the futility of seeking his own trans-

fer *was* to retaliate and to threaten him with constructive discharge if the retirement option was not selected.

(Stetson brief on appeal at 24–25 (emphasis in original)).

No rational trier of fact could accept this contention. In light of the undisputed facts in the record, a rational trier of fact could not conclude that Stetson's working conditions in 1990 were so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign. Thus, we conclude that the defendants were entitled to summary judgment on the ground that there was no genuine issue to be tried as to whether there was a constructive discharge.

## CONCLUSION

We have considered all of Stetson's arguments on this appeal and have found them to be without merit. The judgment dismissing the complaint is affirmed.