Green v. Town of East Haven

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Argued: May 3, 2019          Decided: March 10, 2020)

Docket No. 18-0143

_____

DYANNA L. GREEN,

*Plaintiff-Appellant,*

- v. -

TOWN OF EAST HAVEN,

*Defendant-Appellee,*

EAST HAVEN POLICE DEPARTMENT,

*Defendant.*
_____

Before: KEARSE, WESLEY, and CHIN, *Circuit Judges.*

Appeal from a judgment of the United States District Court for the

District of Connecticut, Vanessa L. Bryant, *Judge*, dismissing, on summary judgment, plaintiff's action against defendant Town of East Haven ("Town") alleging age discrimination in the termination of her employment, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634, and state law. The district court granted summary judgment on the sole ground that plaintiff had failed to make out a prima facie case of any adverse employment action, because she chose to retire rather than attend a scheduled disciplinary hearing--the only merits-based challenge presented in the Town's summary judgment motion. *See Green v. East Haven Police Dep't*, 3:16-cv-00321, 2017 WL 6498144 (D. Conn. Dec. 19, 2017). On appeal, plaintiff contends that the court erred in failing to view her evidence that the retirement was not voluntary but was coerced by the threat of likely termination--and hence constituted a constructive discharge--in the light most favorable to her. We agree that the evidence, viewed in the light most favorable to plaintiff, sufficed to present genuine issues of fact as to whether a reasonable person in plaintiff's shoes would have felt compelled to retire. We thus vacate the judgment and remand for further proceedings.

Vacated and remanded.

KAREN R. KING, New York, New York (Jennifer X. Luo, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, on the brief), *for Plaintiff-Appellant*.

LYNCH, TRAUB, KEEFE & ERRANTE, New Haven, Connecticut (Hugh F. Keefe, of counsel), *submitted a brief for Defendant-Appellee*.

KEARSE, *Circuit Judge*:

Plaintiff Dyanna L. Green appeals from a judgment of the United States District Court for the District of Connecticut, Vanessa L. Bryant, *Judge*, dismissing her action against defendant Town of East Haven ("Town") for alleged age discrimination in terminating her employment, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq*. ("CFEPA"). The district court granted summary judgment dismissing the action on the sole ground that Green had failed to make out a prima facie case of any adverse employment action, because she chose to retire rather than attend a scheduled disciplinary hearing--the only merits-based challenge presented in the Town's summary judgment motion. On

appeal, Green contends that the court erred in failing to view her evidence that the retirement was not voluntary but was coerced by the threat of likely termination--and hence constituted a constructive discharge--in the light most favorable to her. We agree that the evidence, viewed in the light most favorable to Green, sufficed to present genuine issues of fact as to whether a reasonable person in Green's shoes would have felt compelled to retire. Accordingly, we vacate the judgment and remand for further proceedings.

# I. BACKGROUND

Many of the following facts are undisputed, as indicated by the parties' statements submitted pursuant to Local Rule 56(a) as to undisputed and disputed material facts ("Rule 56(a) Statements"). Other descriptions are, as indicated, principally taken from the deposition testimony of the Town's Internal Affairs (or "I.A.") Officer James Naccarato or from the affidavit submitted by Green in opposition to the Town's motion for summary judgment.

A. *Green's Employment at East Haven Police Department*

From about May 2001 through December 2014, Green was an employee of the Town, working at defendant East Haven Police Department ("EHPD" or "Department"). She was one of two full-time employees in EHPD's records division, responsible for processing arrest and accident reports, typing search and arrest warrants, typing misdemeanor and infraction tickets, and entering data into EHPD's computer system. In 2012, EHPD Lieutenant David Emerman became supervisor of the records division. (*See* Rule 56(a) Statements, undisputed ¶¶ 1-3; *see also id*. undisputed ¶ 27.)

Also in 2012, Jennifer Ward was hired to work in the records division, replacing Green's recently retired coworker. (*See id*. undisputed ¶ 6.) Green, 47 years of age when she was hired, was 58 in 2012 (*see* Affidavit of Dyanna L. Green dated September 6, 2017 ("Green Aff." or "September 2017 Affidavit"), ¶¶ 4-5); Ward, in 2012, was approximately 30 years of age (*see id*. ¶ 7). Green asserted that after Ward was hired, Green began to experience treatment from Emerman and EHPD Chief Brent Larrabee that she "believe[s] . . . was intended to create a hostile work environment and cause [her] to retire." (*Id*. ¶ 12; *see id*. ¶ 17 ("I was singled out" and "believe that I was subjected to deliberately disparate treatment and a hostile work

5

environment because of my age, which was intended to make my employment intolerable and force me to resign or retire").)

Green stated, *inter alia*, that from the time Ward arrived until Green left EHPD, Green was made to feel "marginalized in [her] role" (*id*. ¶ 8), with Emerman "engag[ing] in a sustained and systematic pattern of publicly criticizing, micromanaging and scrutinizing" Green's work and "subject[ing her] to harassing and demeaning demands and questioning" (*id*. ¶ 12). Emerman also prepared and filed a number of criticisms of Green's work that Green viewed as unwarranted. (*See id*. ¶ 13.) Meanwhile, Ward was given more desirable work assignments and training opportunities that were denied to Green (*see id*. ¶¶ 8-11) and was treated by Emerman and Chief Larrabee "with obvious favoritism" (*id*. ¶ 8).

B. *The December 2014 Biscuits and Basket Incident*

Shortly after 8 a.m. on December 5, 2014, Green went to the EHPD kitchen/breakroom area to borrow a wire basket that was kept there, to use in an upcoming holiday party. While there, she observed two canisters of Pillsbury buttermilk biscuits dough that she had seen in the communal refrigerator since at least Thanksgiving. Green took one of the canisters, put it and the basket in her tote

bag, and took them back to her desk. (*See* Green Aff. ¶¶ 21-22.)

Shortly after noon that day, EHPD Lieutenant Joseph Murgo sent an email to EHPD employees stating as follows:

> We had two (2) canisters of Buttermilk flavored Pillsbury biscuits that was [*sic*] brought in on Thanksgiving by one of our officers. There is now one canister left, which means one canister grew legs and walked away. If YOU are in possession of Pillsbury Grands Flaky layers Buttermilk biscuits, please return them to their rightful owner. We work in a police department people. Too many things grow legs here. Thank you.

(December 5, 2014 email from Joseph Murgo to All Police Department Employees.)

After receiving that email, Green "asked Lieutenant Emerman if there were cameras in the kitchen." (Rule 56(a) Statements, undisputed ¶ 21.) Green then went into the kitchen area, carrying the biscuits in a bag, intending to return them to the refrigerator. (*See id.* undisputed ¶ 22.) When she arrived, Chief Larrabee was there; and the refrigerator was sealed with, *inter alia*, yellow "crime scene" tape. (Green Aff. ¶¶ 29, 27.)

Chief Larrabee asked Green what was in her bag; she responded only that it contained her salad; she did not tell him that it also contained the biscuits, which she had taken and was about to return to the refrigerator. (*See*, *e.g.*, Rule 56(a) Statements, undisputed ¶¶ 23-25.) "Chief Larrabee then looked in the bag and saw

7

the canister of biscuit[s]." (Green Aff. ¶ 29.) Chief Larrabee took Green back to her desk, as she attempted to explain that she had taken the biscuits with the intent of baking them at home--the communal kitchen at EHPD having no oven (*see id*. ¶ 22)--and bringing the baked biscuits back to the office for officers and staff (*see id*. ¶ 29). Chief Larrabee refused to listen. Arriving at Green's desk, Chief Larrabee saw Green's tote bag and asked what was in it. She showed him the wire basket and attempted to explain that she was temporarily borrowing it for a holiday party, but again he refused to listen. (*See id*.)

Green was immediately placed on administrative leave with pay, having been found to have in her possession a basket that she admitted she had not asked anyone whether she could borrow, and biscuits that she admitted she had not asked anyone whether she could take. (*See, e.g.*, Rule 56(a) Statements, undisputed ¶¶ 14, 18-20; December 11, 2014 Interview of Green by EHPD Internal Affairs Officer James Naccarato ("Naccarato Interview of Green") at 5-6.)

C. *The Disciplinary Process and Green's Resignation*

EHPD in 2014 had a Code of Conduct policy and a policy governing internal affairs complaints. "Under the policy governing the Internal Affairs Officer

8

[*sic*] and Complaints, the Chief of Police and Deputy Police Chief had the authority to determine the merits of an investigation." (Rule 56(a) Statements, undisputed ¶ 29.) Under that policy, the Chief of Police and Deputy Police Chief had the authority to issue "verbal reprimand[s], written reprimand[s], and suspension[s]"; but for more serious allegations they were to forward the investigation to the Town's Board of Police Commissioners ("Town BPC" or "BPC"); only the BPC had the authority to terminate the employee. (*Id*. undisputed ¶¶ 30, 32-33.) The Town and the BPC were subject to a federal consent decree, *see* Agreement for Effective and Constitutional Policing, *United States v. Town of East Haven, East Haven Board of Police Commissioners*, No. 3-12-CV-1652 (D. Conn. Dec. 21, 2012), Dkt. No. 11, which required EHPD to follow a "disciplinary matrix" governing offenses for which an EHPD employee could be discharged (Deposition of James Naccarato ("Naccarato Dep." or "Dep.") at 111). They "ha[d] to follow the matrix." (*Id*.)

In 2014, Naccarato was EHPD's I.A. Officer. In that position, he was required to investigate alleged violations of policies and procedures by EHPD personnel. He conducted an investigation with regard to potential Code of Conduct violations by Green on December 5, 2014. (Rule 56(a) Statements, undisputed ¶¶ 10-15.)

9

As part of his investigation, Naccarato interviewed Green on December 11 in the presence of her union representative. In that interview, Green admitted that, as indicated above, she had taken the biscuits and the basket without asking anyone's permission. She told Naccarato, as she had tried to tell Chief Larrabee on December 5, that she had merely been borrowing the basket for a Hanukkah party, and that she had seen the biscuits in the refrigerator for more than a week and planned to bake them at home and bring them back for officers and staff. When Naccarato asked why she had tried to conceal the basket, Green stated that she was not concealing it. She merely brought the tote bag because it made the basket easier to carry; and it had not occurred to her to ask permission to borrow it, since for the past 13 years she and others (she named two) had borrowed and returned such items as the basket without asking anyone. (*See* Naccarato Interview of Green at 8, 10-12.)

Naccarato's report on his I.A. investigation of Green-- prepared over several days' time and signed on December 18 (*see* Naccarato Dep. 107, 109-10)-- discussed whether Green had violated EHPD's Code of Conduct by, *inter alia*, "impair[ing] the operation or efficiency of the Department or any member" or "[v]iolating any federal, state, and local laws," and concluded that she had done so by engaging in "premeditat[ed] . . . theft" and "purposely conceal[ing] the canister of

biscuits and the basket" (EHPD Internal Affairs Investigation Report No. IA1400000019-00039731 by James W. Naccarato, signed December 18, 2014 ("Naccarato's I.A. Report" or "I.A. Report"), at 1, 3-4). As described in Parts I.D. and II.C.2. below, Naccarato testified in his deposition that he reached his conclusions without interviewing the officer who owned the biscuits or the two persons identified by Green as among those who previously had routinely borrowed baskets without needing to ask permission (*see* Dep. 87-88, 94-96); he also testified as to what he may have told Green he believed were her prospects for remaining employed at EHPD (*see id*. at 35, 85-90).

A hearing into the charges against Green had been scheduled for December 15, 2014. On that date, after receiving advice from her union representative who had just met with Town representatives, including Chief Larrabee, she submitted a letter stating, "I Dyanna Green, hereby retire from the town of East Haven, effective January 1st 2015."

D. *The Present Action*

In February 2016, Green, then proceeding *pro se*, commenced the present action against EHPD and the Town. After counsel was appointed to represent her,

a First Amended Complaint ("Complaint") was filed, asserting that her employment had been constructively terminated because of her age in violation of the ADEA, 29 U.S.C. §§ 621-634, and CFEPA, Conn. Gen. Stat. § 46a-60 *et seq*. As Green had been an employee of the Town, EHPD was dismissed from the action by stipulation.

In July 2017, after Green had taken the depositions of Emerman and Naccarato, the Town moved for summary judgment dismissing the Complaint on the ground, to the extent pertinent to this appeal, that Green had not made out a prima facie case of discrimination. In so contending, the Town argued only that because Green had chosen to resign rather than participate in a hearing before the Town BPC, *see Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985) (a tenured public employee is constitutionally entitled to, *inter alia*, a pretermination hearing at which she is given an opportunity to present her position) ("*Loudermill* hearing"), she could not establish that she had suffered an adverse employment action.

In opposition to the motion, Green disputed the claim that her resignation had been voluntary, contending that she had essentially been forced to resign because she was told that if she did not, she would be fired. In support of her contention, she submitted her September 2017 Affidavit, stating in part as follows:

12

31. On December 11, 2014, I sat for an interview with Officer Naccarrato [*sic*] as part of the EHPD's formal investigation. . . . Following the conclusion of the interview, I . . . asked Officer *Naccarato*--who held the position of *Internal Affairs Officer, was obviously familiar with the EHPD's disciplinary procedure and matrix*, and whose judgment I respected--what was going to happen to me. Officer Naccarato responded in substance: (i) that I had stolen from the EHPD; (ii) *that Chief Larrabee and other members of the EHPD no longer trusted me or wanted me to continue working at the EHPD*; (iii) *that I likely would be fired*; and (iv) *if there was a possibility of me resigning or retiring, I should do so.*

32. Based on this conversation, *I understood* that as a result of Officer Naccarato's incorrect determination that I had engaged in a theft, *it was inevitable that I would be fired under the EHPD's disciplinary matrix, and that my only option would be to retire.*

33. On or about December 15, 2014, I was scheduled to appear with my union representatives, Sandy Santos and Tom Fascio, before representatives from the Town, including the Town's attorneys.

34. At the meeting, Mr. Fascio met individually with the Town's representatives. Mr. Fascio then advised me that the *Town had no interest in* speaking with or *hearing from me.* He then further advised that *the Town's position* was that I could either *retire* or move forward with a L[o]udermill hearing. *He advised me that, based on his discussions with the Town's representatives, including Chief Larrabee, I would almost certainly lose a L[o]udermill hearing.*

35. Based on the statements and advice of Officer Naccarato, as confirmed by my union representative's advice, I was forced to "retire" effective as of December 31, 2014. I did so under duress. It had been my intention to work for at least another nine years, until I was 70.

13

(Green Aff. ¶¶ 31-35 (emphases added).)

In support of the above statements that she had been advised by Naccarato that she should resign because she was otherwise likely to be fired, Green pointed, in part, to the following deposition testimony by Naccarato. Although no one had suggested to Naccarato "in substance," that "we are going to try and fire [Green] over this," he testified that

> *when you look at the disciplinary matrix, that violation falls in that category.*
>
> Q. *A fire-able offense?*
>
> A. *Yes.*
>
> Q. So it was your expectation that she was going to be fired over this?
>
> A. *We have to follow the disciplinary matrix.*

(Naccarato Dep. 89 (emphases added).) And after Naccarato said that on December 11, 2014, he "probably" had some discussion with Green "that was not recorded" in her statement (*id.* at 33-34), he testified as follows:

> Q. . . . [D]o you recall discussing with [Green] after the statement was taken *what was going to happen to her?*
>
> A. *I don't **specifically** remember* but if she asked me, *I would have told her what I thought.*

Q. And what would you have told her?

A. It didn't look good, stealing in the police department.

Q. Did you tell her in substance that you recommended that she retire because nobody trusted her anymore?

A. I *don't remember saying* that.

Q. Do you remember her asking you what you thought was going to happen to her?

A. *I don't **specifically** remember* but I couldn't say she didn't ask me.

Q. Okay.

A. And *if she asked me, I would have told her*.

Q. And what would you have told her?

A. That *it's stealing from a police department, you have a potential to get fired for it. We have a disciplinary matrix that we go by and that's where it falls in there.*

Q. Do you recall telling her that it was likely she was going to be fired unless she took retirement?

A. I don't recall *specifically* saying that but *if she asked me what I thought, I would have told her.* I would have been honest with her. I was always honest with her.

(*Id.* at 34-35 (emphases added).)

15

E. *The District Court's Decision*

The district court, in an opinion dated December 19, 2017, granted the Town's motion to dismiss the action for lack of a prima facie case. *See Green v. East Haven Police Dep't*, 3:16-cv-00321, 2017 WL 6498144, at \*6-\*9 (D. Conn. Dec. 19, 2017) ("*Green*"). The court noted the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas*"), under which a prima facie case of discrimination

> consists of proof that a plaintiff (1) was within a protected class; (2) was qualified for her position; (3) *was subject to an adverse employment action*; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.

*Green*, 2017 WL 6498144, at \*6 (emphasis added). Because the Town challenged only the third *McDonnell Douglas* element and the parties did not address any of the others, the court considered only whether Green adduced sufficient evidence to show a triable issue as to whether she had suffered an adverse employment action. *See id*. at \*4, \*7. It concluded that she had not.

The district court noted that an "adverse employment action" is one that causes a "materially adverse change in the terms and conditions of employment," that "[o]ne example of a materially adverse action is constructive discharge"--a work

16

condition so intolerable "that when[] viewed as a whole . . . a reasonable person in the employee's shoes would have felt compelled to resign"--and that "[t]hreats of termination can constitute evidence of constructive discharge." *Id*. at *7 (internal quotation marks omitted) (citing, *inter alia*, *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) ("ample evidence" demonstrated a triable issue of fact that plaintiff was constructively discharged because plaintiff was notified "he would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance")).

However, the court also observed that a claim of constructive discharge is not sufficiently supported merely by a showing that the plaintiff "resign[ed] to avoid facing disciplinary charges" or simply "fear[ed] termination." *Green*, 2017 WL 6498144, at *7. A "plaintiff's failure to go through an available pre-termination hearing process is evidence that she was not constructively discharged," and this "often precludes a plaintiff's ability to survive summary judgment." *Id*. But "evidence [that] an employee was given the choice to either resign or be fired can be sufficient to create a triable issue of fact." *Id*. "When determining if a threat of termination is sufficient, courts have relied on factors including whether the threats of termination were repeated, direct, or involved additional adverse conduct." *Id*. (internal quotation

marks omitted).

The court found particularly illustrative the case of *Gorham v. Town of Trumbull Board of Education*, 7 F.Supp.3d 218 (D. Conn. 2014) ("*Gorham*"), in which a high school's night custodian had found a musical instrument in the trash and, assuming that it was abandoned, took it home intending to donate it to his church. He was summoned to

> a disciplinary hearing, charging him with "theft of items belonging to a public entity," "dishonesty and lying to [his] supervisors," and "violation of the trust inherent in his position." . . . . He was informed that possible discipline included suspension or termination. . . . *The Board of Education plant administrator was alleged to have told him at the disciplinary hearing, "Lester, you're better off resigning right now; if not, we'll have you charged."* . . . . *The plaintiff also averred that his union representative stated, "Lester,* this is tough. *If you don't . . . resign, they'll not only have you charged; even if you feel like you're right . . . you'll still be messed up."* . . . . The plaintiff resigned on the day of the hearing. . . . *The court found the evidence sufficient to constitute constructive discharge because "a reasonable person in Gorham's shoes would have felt compelled to resign."* . . . . In short, *during the hearing one of the decision makers* and his union representative *essentially told Gorham the outcome of the hearing would be unfavorable and advised him to resign immediately before the decision was rendered.*

*Green*, 2017 WL 6498144, at *8 (quoting *Gorham*, 7 F.Supp.3d at 225, 232 (emphases ours)).

The district court here found that the facts leading to Green's resignation

18

did not measure up to the facts described in *Gorham*. It stated that, "[i]n analyzing a constructive discharge claim, *the Court must* carefully *balance the facts to determine whether* a reasonable person *would have* considered the pre-termination hearing a meaningful process or a formality with a predetermined negative outcome." *Green*, 2017 WL 6498144, at *8 (emphases added). It concluded that its "*analysis of the facts* in this case *reveals that the plaintiff chose*"--"*she elected on her own*"--"to resign despite having a viable pre-termination hearing process . . . . for two reasons." *Id*. (emphases added).

> *First, Plaintiff had no basis to prejudge the decision makers.* Although Officer Naccarato found that she had violated the Code of Conduct, that she was found to have committed an act for which she could be terminated, that Chief Larrabee and others did not trust or want to work with her, and that he thought she should resign, *neither he nor Chief Larrabee were decision makers. Neither . . . had the authority to terminate her*.

*Id*. (emphases added). Second, despite Green's assertion that "'[b]ased on [her December 11] conversation [with Naccarato], *I understood that* as a result of [his] incorrect determination that I engaged in a theft, *it was inevitable that I would be fired under the EHPD's disciplinary matrix, and that my only option would be to retire*,'" *id*. (quoting Green Aff. ¶ 32 (emphases ours)), the court found such an understanding unreasonable:

19

EHPD Policy Number 208.2 makes clear that only the BPC has the authority to terminate an employee and may do so only after a full evidentiary Board hearing. . . . *At such a hearing Plaintiff could have offered the testimony of her longstanding coworkers demonstrating that her conduct was conventional.* That process had not begun and *no one advised Plaintiff of the likely outcome of that process.* Indeed, *a reasonable person in Plaintiff's shoes would not have concluded it was **inevitable*** that she would be fired after speaking with someone uninvolved in the decisionmaking process.

*Green*, 2017 WL 6498144, at *8 ("inevitable" emphasized in original; other emphases added). The district court found it

*unavailing* that [Green's] union representative advised her "the Town's position was that [she] could either retire or move forward with a L[o]udermill hearing" but that she "would *almost certainly* lose a L[o]udermill hearing." [Green Aff.] ¶ 34. *In light of the fact that there is no evidence Plaintiff's termination was automatic, the loss of a Loudermill hearing would not have inevitably led to termination.* These statements appear to be nothing more than an *educated guess about a certain outcome.*

*Green*, 2017 WL 6498144, at *8 (emphases ours). The court found that

[u]nlike the plant administrator in *Gorham*, *nobody gave Plaintiff an ultimatum or threatened her with criminal charges*, and *there is no evidence the final decision maker would have even terminated her employment.* The Court finds that Plaintiff[] . . . cannot show constructive discharge because *she elected on her own* to forego a hearing made available to her.

*Id.* (emphases added).

The court granted summary judgment in favor of the Town, concluding that "[i]n failing to establish an adverse employment action, Plaintiff cannot establish a *prima facie* case for her ADEA or CFEPA claims." *Id*. at *9.

## II. DISCUSSION

On appeal, Green contends that the granting of summary judgment against her for failure to show an adverse employment action was error because the evidence, viewed in the light most favorable to her, showed that she was constructively discharged by the Town because she believed, and objectively reasonably believed, that if she did not resign she would be discharged. As this was the only merits-related argument presented to and considered by the court, we agree that summary judgment was inappropriate.

A. *ADEA Principles*

The ADEA provides, in pertinent part, that as to a person over the age of 40, *see* 29 U.S.C. § 631(a), "[i]t shall be unlawful for an employer . . . to discharge [the] individual . . . because of such individual's age," *id*. § 623(a)(1). "In order to

21

establish a prima facie case of age discrimination," the plaintiff "must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). As to the fourth element of the prima facie case, the Supreme Court has made "clear that 'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Id*. at 106 (quoting *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009)). Only the third element of the prima facie case is at issue on this appeal, however, because the only merits-related basis for summary judgment presented by the Town's motion was that Green had failed to show an adverse employment action, and that was the only such basis for summary judgment considered by the district court, *see Green*, 2017 WL 6498144, at *4, *7.

Plainly an employee's "discharge," 29 U.S.C. § 623(a)(1), is an adverse employment action. To satisfy the third element of the prima facie case, a discharge may consist of either the employer's actual termination of the plaintiff's employment

22

or the existence of intolerable conditions, attributable to the employer, amounting to a "constructive" discharge. *See, e.g., Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998) ("*Kirsch*"); *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir. 1993) ("*Stetson*"); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) ("*Pena*"). "[T]he plaintiff's burden of establishing a *prima facie* case in a discrimination suit is *de minimis*." *Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 90 (2d Cir. 1999) ("*Chertkova*") (Title VII claim of gender discrimination) (internal quotation marks omitted).

An employee's rights under federal antidiscrimination statutes may be "violated by *either explicit or constructive* alterations in the terms or conditions of employment," and if constructive, the alterations, to be actionable, "must be severe or pervasive." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752 (1998) ("*Ellerth*") (emphasis added) (discussing Title VII principles announced in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)); *see, e.g., Pena*, 702 F.2d at 325 (ADEA claim). "*A discriminatorily abusive work environment . . .* can *. . . discourage employees from remaining on the job . . . .*" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993) (emphases added); *see, e.g., id.* at 19 (after the company president's last sexually harassing comment, "Harris collected her paycheck and quit").

A plaintiff may prove a *constructive discharge* by establishing that his employer, rather than acting directly, deliberately ma[de his] working conditions *so intolerable* that [he was] forced into an involuntary resignation,

*Kirsch*, 148 F.3d at 161 (ADEA claim) (internal quotation marks omitted (emphases ours)), and such an intolerable condition may be shown by evidence that the employer gave the plaintiff the choice of resigning or being fired, *see, e.g., Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) ("*Lopez*") (claim of ethnic discrimination in violation of 42 U.S.C. § 1981).

However, as the district court noted, a constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of her assignments or criticism of her work, or where the employee found the working conditions merely "difficult or unpleasant." *See Green*, 2017 WL 6498144, at *7 (citing *Stetson*, 995 F.2d at 360). Rather, the standard for assessing whether the alterations have become intolerable is an objective one:

Conduct that is not severe or pervasive enough to create an *objectively* hostile or abusive work environment--an environment *that a reasonable person* would find hostile or abusive--is beyond Title VII's purview.

*Harris*, 510 U.S. at 21 (emphases added). Accordingly, the principle we have consistently applied is that a plaintiff makes a prima facie showing of an adverse

24

employment action if she adduces evidence from which a rational juror could infer that the employer made her working condition, viewed as a whole, "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kirsch*, 148 F.3d at 161 (internal quotation marks omitted); *see, e.g.*, *Chertkova*, 92 F.3d at 89; *Stetson*, 995 F.2d at 361; *Lopez*, 831 F.2d at 1188; *Pena*, 702 F.2d at 325.

The fact that this substantive standard is an objective one, however, does not necessarily mean that what a reasonable person in the plaintiff's shoes would have felt compelled to do is determinable as a matter of law, for an objective question is often fact-specific. It hardly need be said that the determination of whether it was objectively reasonable for an employee to feel compelled to resign in order to avoid being fired requires at least an examination of the information possessed by the employee. If any relevant facts are in dispute or subject to competing inferences as to their effects, or if there is admissible evidence from which a rational juror could infer that a reasonable employee would have felt so compelled, rejection of the constructive-discharge theory as a matter of law is impermissible. *See, e.g.*, *Kirsch*, 148 F.3d at 161-62 (affirming denial of defendants' posttrial motion for judgment as a matter of law); *Lopez*, 831 F.2d at 1189 (reversing grant of defendant's motion for

summary judgment). In *Lopez*, for example, we observed that

> [t]he record in this case amply demonstrates that Lopez has raised a genuine issue of fact as to whether he was constructively discharged when, as he alleges, Hunsberger [a regional director who was Lopez's supervisor] *told him he would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance.* A trier of fact might find that Hunsberger's statement alone suffices to establish a constructive discharge. *See Welch v. University of Tex. & Its Marine Science Inst.*, 659 F.2d 531, 533-34 (5th Cir. 1981) (finding constructive discharge where employer clearly expressed his desire that employee resign because such a statement would force a reasonable person to resign).

*Lopez*, 831 F.2d at 1188-89 (emphasis added).

In contrast, some cases present records so insubstantial that no rational factfinder could infer that a reasonable employee in the plaintiff's shoes could have felt compelled to resign. In *Stetson*, for example, we found the evidence insufficient to show a prima facie case of constructive discharge where the employer "never mentioned retirement to Stetson and never either expressly or impliedly suggested that Stetson's employment would be terminated." 995 F.2d at 361; *see also Pena*, 702 F.2d at 325-26 (reversing denial of the defendant's motion for a directed verdict for lack of evidence of a constructive discharge where, although the plaintiff's role was "somewhat" changed, she was not faced with loss of pay or change in title, and it was

26

her "own understanding throughout the relevant period"--"[t]aking her own testimony in the light most favorable to her"--"that [the employer] wished her to remain" in its employ).

B. *Summary Judgment Principles*

A motion for summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On such a motion, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ("*Liberty Lobby*"). Thus, in ruling on a motion for summary judgment, "the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Kessler v. Westchester County Department of Social Services*, 461 F.3d 199, 206 (2d Cir. 2006) (internal quotation marks omitted).

"[A]t the summary judgment stage the judge's function is not himself to

27

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Id*. at 255.

These standards also govern our review on appeal. Where "[s]ummary judgment was granted for the employer, . . . we must take the facts alleged by the employee to be true." *Ellerth*, 524 U.S. at 747.

C. *The Present Case*

In this case we have difficulties both with the substantive legal standard adopted by the district court and with the court's treatment of the summary judgment record.

1. *The Substantive Legal Principle Adopted*

In granting summary judgment against Green for lack of proof of any adverse employment action, the district court stated in part that "[u]nlike the [decisionmaker] in *Gorham*, nobody gave Plaintiff an ultimatum [to resign or be fired]

or threatened her with criminal charges." *Green*, 2017 WL 6498144, at \*8. But *Gorham* merely discussed evidence of statements that were especially clear, authoritative, and ominous, from which a constructive discharge could be inferred. That evidence did not mark the minimum standard for what is actionable.

Abuses may take many forms and be delivered in many ways. The district court's transmutation of the facts in *Gorham* into a substantive controlling principle--ruling that a plaintiff cannot show that a threat of termination constituted a constructive discharge unless the threat (a) was a categorical ultimatum that if she did not resign she would be fired, and (b) was delivered by an ultimate decisionmaker as to firing--imposed a legal standard at an unwarranted level of specificity.

While the identity of the person delivering a termination threat or prediction and the level of certainty expressed in such a threat or prediction are considerations for a factfinder to weigh, neither an absolute statement nor a direct communication by an ultimate decisionmaker is a *sine qua non* for evidence of a constructive discharge. For example, in *Lopez*, in which the plaintiff was told by his supervisor that he would be fired at the end of his probationary period regardless of how well he performed, we stated that a factfinder could permissibly "find that [that]

29

statement alone suffices to establish a constructive discharge," 831 F.2d at 1188; but nothing in our opinion suggested that the supervisor was a decisionmaker with respect to firing. In *Stetson*, in concluding that there was not sufficient evidence to show a prima facie case of constructive discharge, we considered not just whether the employer told Stetson "expressly" that his employment would be terminated, but alternatively whether he so "suggested" "impliedly," 995 F.2d at 361. And indeed, our *Lopez* opinion indicated that a constructive discharge could properly be found where an employer merely, albeit "clearly[,] expressed *his desire* that [an] employee resign because such a statement" could cause a reasonable person to feel compelled to resign, 831 F.2d at 1188-89 (emphasis added).

Thus, contrary to the standard applied by the district court here in finding that Green's constructive-discharge argument failed because her evidence was less stark than that in *Gorham*, the established standard--as discussed in Part II.A. above, and indeed as reflected in *Gorham* itself--is whether in light of the evidence as a whole as to intolerable working circumstances, "a reasonable person in the employee's shoes would have felt compelled to resign," *Kirsch*, 148 F.3d at 161; *Chertkova*, 92 F.3d at 89; *Stetson*, 995 F.2d at 361; *Lopez*, 831 F.2d at 1188; *Pena*, 702 F.2d at 325; *see Gorham*, 7 F.Supp.3d at 232.

30

## 2. *The District Court's Assessment of the Record*

In addition to imposing an unduly stringent standard for proof of a constructive discharge, the district court engaged in a "balanc[ing of] the facts," from which the court inferred that a reasonable person in Green's shoes would not have felt compelled to resign in order to avoid termination, and found that Green in fact "chose"--"elected on her own"--to resign rather than to proceed with the *Loudermill* hearing, *Green*, 2017 WL 6498144, at *8. But on a motion for summary judgment, the court's job was not to weigh the evidence, but rather was to accept as true the facts that were sworn to or undisputed, and with all permissible inferences therefrom drawn in Green's favor, to determine whether a rational juror could find that a reasonable employee would have felt so compelled. The record as a whole, viewed in the light most favorable to Green, precluded the grant of summary judgment.

Preliminarily, we note that one of the *Gorham* facts that the district court noted Green failed to match was that Gorham had been expressly threatened with criminal prosecution, whereas Green was not so threatened. Although ordinarily one might reasonably have no fear of being criminally prosecuted for taking a $2-$3 package of biscuit dough, EHPD's treatment of the biscuits affair was hardly

31

ordinary. The district court's suggestion that Green could have had no thought of being prosecuted criminally ignored the facts that, on arriving in the EHPD kitchen in her attempt to return the biscuits, Green had been "confronted by Chief Larrabee" who, telling her "it was a crime scene," barred her from opening the refrigerator, which was covered with "yellow 'crime scene' tape" (Green Aff. ¶¶ 27, 29).

More importantly, we have difficulty with the district court's view that an employee in Green's shoes would not have had any reasonable belief that her firing was inevitable (as her affidavit claimed), an inference drawn from the district court's findings that "no one advised Plaintiff of the likely outcome" of a BPC hearing, and that she thus "had no basis to prejudge the [*Loudermill* hearing] decision makers," *Green*, 2017 WL 6498144, at *8. The findings that "no one" had given Green such advice and that there was "no basis" for her to believe that she would lose in a hearing did not take into account all of the evidence in the record, and surely did not view the evidence in the light most favorable to Green. First, the court characterized the hearing scheduled for Green as a "viable" pretermination process, in which she "could have offered the testimony of her longstanding coworkers *demonstrating* that her conduct was *conventional*," *id*. (emphases added). But Green had cited past customary practices of herself and coworkers only to explain borrowing the basket; she did not

32

claim any longstanding practice with respect to taking the biscuits. Moreover, the court did not mention either (a) the I.A. Report's findings that Green had committed "premeditat[ed] . . . theft" and had "purposely concealed" the theft (I.A. Report at 3), or (b) the undisputed fact that "*authority to determine the merits* of an [I.A.] investigation" resided in the Chief of Police (Rule 56(a) Statements, undisputed ¶ 29 (emphasis added)). Thus, although Chief Larrabee was not an ultimate decisionmaker as to whether Green should be fired, the record is contrary to the district court's view that Green had a "viable" chance of having the Town BPC overrule the Police Chief's I.A. determinations that Green had engaged in theft and duplicity.

Second, there was evidence in the record that Green received advice from knowledgeable persons, on both sides of the aisle, that the *Loudermill* hearing would "likely," and indeed "almost certainly," result in her termination:

- EHPD was subject to a consent decree that required it to follow a disciplinary matrix governing circumstances under which a Department employee could be fired (*see* Naccarato Dep. 111);

- Naccarato, as EHPD's Internal Affairs Officer, was familiar with (*see id*. 114-16)--and was understood by Green to be familiar with (*see* Green Aff. ¶ 31)--the EHPD disciplinary matrix;

- Green stated that when she asked Naccarato what he thought

was going to happen to her, Naccarato told her that Chief Larrabee and other members of EHPD no longer trusted her and did not want her to continue working at EHPD (*see* Green Aff. ¶ 31);

■ Naccarato advised Green that if the I.A. charges were upheld she, in accordance with the consent-decree-mandated disciplinary matrix, "likely would be fired" (*id*.);

■ Green stated that Naccarato advised her that if she could "resign[] or retir[e]," she "should do so" (*id*.);

■ Naccarato testified that he did not remember "specifically" Green's asking his view of what was going to happen to her (Dep. 34) or "specifically" advising her that she should resign or retire (*id*. at 35); but he testified that "if she asked," he would have told her what he honestly thought (*id*.);

■ Naccarato testified that he would have told Green that stealing from the police department falls into the "disciplinary matrix" category of a "fire-able offense" (Dep. 35, 89);

■ Naccarato testified that if I.A. charges showed a firing offense, the disciplinary matrix left the BPC "very little" room for an exercise of discretion (Dep. 111); and, finally,

■ Green stated that on the day of the scheduled hearing, her union representative met initially with Town representatives, who said the Town did not want to hear from Green and that she could either have the *Loudermill* hearing or retire; and her union representative advised her, "based on his discussions with the Town's representatives, including Chief Larrabee," that she would "almost certainly" lose at the hearing (Green Aff. ¶ 34).

The district court's view that there was "no basis" for a reasonable belief that Green

34

would lose a *Loudermill* hearing is contradicted by the evidence.

While the district court did note Green's statement that her union representative advised her that she would "'almost certainly lose'" in a *Loudermill* hearing, *Green*, 2017 WL 6498144, at *8, the court found that advice--though admittedly "educated"--to be "unavailing" because there was no evidence that termination was automatic or inevitable, *id*. This outright dismissal as to any value or effect of advice from the union representative seems to indicate the court's belief that, despite having received an I.A. officer's informed view that she has committed a fire-able offense, a reasonable employee, as a matter of law, cannot feel compelled to resign rather than insist on a hearing when her union representative--who is presumably looking after her interests--makes an "educated" prediction that she is almost certain to lose in the hearing. We know of no authority supporting such a principle of law. And to the extent that the court found the union representative's advice "unavailing" simply as a matter of fact--*i.e.*, as outweighed by other evidence as to what a reasonable employee in Green's shoes "would" have felt compelled to do, *id*.--the court so found by impermissibly conducting its own weighing of the evidence and by drawing all inferences adversely to Green.

In sum, the evidence to be considered as to whether Green suffered a

constructive-discharge adverse employment action, viewed in the light most favorable to Green on this issue, included the facts that the 61-year-old Green (1) had admitted taking items from the EHPD kitchen without permission; (2) had admitted initially lying to the Chief of Police about her actions; (3) had immediately been caught by the Chief of Police in that lie; (4) was found in the Internal Affairs investigation (a) to have stolen those items premeditatedly and (b) to have attempted to conceal the theft; (5) had been told by the Internal Affairs Officer that the Chief of Police and other members of the Department no longer trusted her and did not want her to continue working at EHPD; (6) had been advised by the Internal Affairs Officer (a) that if the I.A. Report were upheld she, in accordance with the EHPD consent decree disciplinary matrix, "likely would be fired," and (b) that if she could resign or retire she "should do so"; and (7) had been advised by her own union representative, who had just conferred with the Town representatives, that she would "almost certainly" lose at a *Loudermill* hearing. If this case were tried, a factfinder, applying the correct legal standard to the issue of constructive discharge, could rationally find that an employee in Green's shoes would have felt compelled to submit her resignation stating that she was retiring, rather than face nearly certain termination.

The district court erred in granting summary judgment on the basis that

such a finding would be impermissible.

CONCLUSION

We have considered all of the Town's appellate arguments in support of summary judgment and have found them to be without merit. The judgment dismissing Green's claims under the ADEA and CFEPA is vacated, and the matter is remanded for further proceedings. As the Town's merits challenge to Green's action focused only on the element of adverse employment action, we do not rule out the possibility of further pretrial proceedings focusing on other elements.

If Green ultimately prevails on the merits of her action, she will be entitled to the costs of this appeal.