# OHAN KARAGOZIAN *v.* USV OPTICAL, INC.
## (SC 20257)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff employee sought to recover damages from the defendant
employer, alleging that he was constructively discharged in violation of
public policy. The plaintiff had been employed as a licensed optician
manager in the defendant's optical department in a JCPenney store and
alleged that the defendant improperly required him to provide optomet-
ric assistance services to the doctor of optometry in the store. The

---

[19] Although our case law does not expressly preclude damages for personal
injuries arising from innocent misrepresentations, we observe that such
liability would be inappropriate in the present case. "The defendant may
be subjected to liability for innocent misrepresentation causing *stand-alone
economic harm* when the defendant undertakes to guarantee the truth of
the matter represented, that is, when his representation is a warranty. Where
a warranty is breached, the plaintiff may *recover the contract or loss of
bargain measure of damages*." (Emphasis added.) 3 D. Dobbs et al., The
Law of Torts (2d Ed. 2011) § 669, p. 661; see 3 Restatement (Second), supra,
§552C, comment (f), p. 145 (noting that innocent misrepresentation damages
"are restitutionary in nature" and "in effect [restore the plaintiff] to the
pecuniary position in which he stood before the transaction," and that,
because "the defendant's misrepresentation is an innocent one, *he is not
held liable for other damages*; *specifically, he is not liable for benefit of
the bargain or for consequential damages*" (emphasis added)); see also
*Johnson* v. *Healy*, supra, 176 Conn. 106 ("[t]he proper test for damages was
the difference in value between the property had it been as represented
and the property as it actually was"). Thus, it appears that this damages
calculation would not provide the plaintiffs with any significant relief
because the damages for personal injuries stemming from the mesh would
be limited to the difference between what the plaintiffs paid for the mesh
product and the value of the mesh retained.

Karagozian *v.* USV Optical, Inc.

plaintiff claimed that, under a declaratory ruling issued by the Board of Examiners for Optometrists and a cease and desist consent order issued by the Board of Examiners for Opticians, employees, including opticians, under the control of unlicensed third parties were prohibited from performing services for licensed optometrists. The plaintiff also alleged that his duties violated the public policy embodied in the statute (§ 31-130 (i)) requiring JCPenney and the defendant to have a staffing permit before providing staffing services to the optometrist. The plaintiff further alleged that he was forced to resign when the defendant refused his requests to be excused from these duties. The defendant moved to strike the plaintiff's complaint on the ground that its allegations could not satisfy the requirements of a constructive discharge claim. The defendant asserted that the declaratory ruling and the cease and desist order were not binding and did not create a private right of action for optometric assistants. The defendant also alleged that the plaintiff's reliance on § 31-130 (i) was misplaced because the plaintiff did not allege that optometrists employed by the defendant charged the defendant for hiring opticians. The trial court, relying on *Brittell* v. *Dept. of Correction* (247 Conn. 148), determined that, to prevail on his constructive discharge claim, the plaintiff was required to demonstrate that the defendant intended to force him to resign. The trial court granted the defendant's motion to strike the plaintiff's complaint and rendered judgment for the defendant. The plaintiff appealed to the Appellate Court, which affirmed the trial court's judgment. The Appellate Court, interpreting and applying *Brittell* in the same manner as the trial court, concluded, inter alia, that there was no allegation in the plaintiff's complaint that reasonably could be construed to claim that the defendant intended to create conditions so intolerable that a reasonable person in the plaintiff's shoes would be compelled to resign. On the granting of certification, the plaintiff appealed to this court. *Held*:

1. The Appellate Court incorrectly interpreted the standard set forth in *Brittell* to require the plaintiff to assert facts demonstrating that the defendant intended to force him to resign, *Brittell* having required the plaintiff to establish only that the defendant intended to create an intolerable work atmosphere; the *Brittell* standard for constructive discharge requires a subjective inquiry into whether the employer intended to create the complained of employment atmosphere or condition and an objective inquiry into whether that atmosphere or condition would have led a reasonable person in the employee's shoes to feel compelled to resign, and that standard does not require the employee to allege facts showing that the employer intended to force the employee to resign.

2. Although the Appellate Court incorrectly applied the standard for constructive discharge in *Brittell*, that court correctly upheld the trial court's granting of the defendant's motion to strike the plaintiff's complaint on the alternative ground that the plaintiff had failed to allege facts establishing that his work atmosphere was so difficult or unpleasant

Karagozian *v.* USV Optical, Inc.

that a reasonable person in his shoes would have felt compelled to resign, and, accordingly, this court affirmed the judgment of the Appellate Court: nothing in the plaintiff's complaint established that the defendant required him to violate the law, as the declaratory ruling evaluated the circumstances under which an optometrist would be considered an employee of an unlicensed person or entity, and the plaintiff was employed as an optician rather than an optometrist, the declaratory ruling was binding only on those, unlike the plaintiff, who participated in the hearing that led to the ruling, and the ruling, which was intended to provide guidance to optometrists, did not establish criminal liability or inflict repercussions for specific conduct that would compel a reasonable optician in the plaintiff's shoes to resign; moreover, the plaintiff failed to demonstrate that the cease and desist order either applied to him or bound the defendant, as the order required that a store different from the one in which the plaintiff worked not permit a licensed optician to act in the capacity of an optometric assistant to an independent optometrist leasing space in the store, and also failed to demonstrate how the consent order functionally created a work condition so intolerable that a person in the plaintiff's shoes would have been justified in walking off the job as if he had been fired; furthermore, contrary to the plaintiff's claim, § 31-130 (i) was inapplicable, as it requires only that a person who procures or offers to procure employees for employers register with the Commissioner of Labor, and the allegations of the plaintiff's complaint did not suggest that the defendant intended to create conditions different from what the plaintiff would have expected when he agreed to work as a licensed optician manager for the defendant.

Argued December 12, 2019—officially released April 15, 2020*

*Procedural History*

Action to recover damages for the plaintiff's alleged constructive discharge from employment, brought to the Superior Court in the judicial district of New Haven at Meriden, where the court, *Hon. John F. Cronan*, judge trial referee, granted the defendant's motion to strike the revised complaint; thereafter, the court, *Harmon, J.*, granted the plaintiff's motion for judgment and rendered judgment for the defendant, from which the plaintiff appealed to the Appellate Court, *DiPentima, C. J.*, and *Lavine* and *Moll, Js.*, which affirmed the judg-

* April 15, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

335 Conn. 426 OCTOBER, 2020 429

Karagozian *v.* USV Optical, Inc.

ment of the trial court, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed.*

*John R. Williams*, for the appellant (plaintiff).

*Robert M. Palumbos*, pro hac vice, with whom was *Elizabeth M. Lacombe*, for the appellee (defendant).

*Scott Madeo* and *Brian Festa* filed a brief for the Commission on Human Rights and Opportunities as amicus curiae.

*Opinion*

D'AURIA, J. The plaintiff, Ohan Karagozian, an optician formerly employed by the defendant, USV Optical, Inc.,[1] brought this action for constructive discharge, alleging that (1) the defendant required him to provide optometric assistance services to a doctor of optometry in violation of the public policy of the state of Connecticut, (2) the defendant refused and failed to excuse the plaintiff from those duties, and (3) "[a]s a result, the plaintiff was compelled to resign his position with the defendant . . . ." The defendant moved to strike the plaintiff's corrected revised complaint on the ground that the allegations in the complaint could not, as a matter of law, satisfy the requirements of a constructive discharge claim.[2] The trial court granted the defendant's motion to strike, relying on *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 178, 717 A.2d 1254 (1998), for the proposition that a claim of constructive discharge requires a plaintiff to demonstrate that the employer intended to force the employee to resign. The trial court

_____

[1] The plaintiff alleged that USV Optical, Inc., is a Texas corporation headquartered in New Jersey that owns and operates optical departments in JCPenney stores at various locations in Connecticut.

[2] The operative complaint for purposes of the present appeal is the corrected revised complaint filed on December 19, 2016. The defendant also moved to strike the plaintiff's complaint on the ground that the plaintiff asserted a claim for which no private right of action exists. The trial court did not address that issue, and the parties did not raise it on appeal.

Karagozian *v.* USV Optical, Inc.

determined that the plaintiff had not only failed to allege this intent requirement in his complaint, but also failed to allege the second requirement of a constructive discharge claim—that his work conditions became so intolerable that a reasonable person in his shoes would have felt compelled to resign.

Interpreting and applying our decision in *Brittell* in the same fashion as the trial court, the Appellate Court affirmed the trial court's judgment, concluding that there was "no allegation in the complaint that reasonably [could] be construed to claim that the defendant *intended* to create conditions so intolerable that a reasonable person would be compelled to resign." (Emphasis in original.) *Karagozian* v. *USV Optical, Inc.*, 186 Conn. App. 857, 867–68, 201 A.3d 500 (2019). We disagree with the Appellate Court's interpretation of *Brittell*, although we affirm its judgment on the alternative ground it identified.

To plead a prima facie case of constructive discharge, a plaintiff must allege that (1) the employer intentionally created the complained of work atmosphere, (2) the work atmosphere was so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (3) the plaintiff in fact resigned. *Brittell* does not, as the Appellate Court has ruled in several cases, require a plaintiff claiming constructive discharge to allege that the employer intended to force the employee to quit, but only to allege that the employer intended to create the *conditions* that the plaintiff claims compelled the employee to quit. However, in the present case, we agree with the Appellate Court and the defendant that the plaintiff failed to sufficiently allege the second requirement of a constructive discharge claim in his complaint. Specifically, the plaintiff's complaint fails as a matter of law to allege that the defendant created a work atmosphere so difficult

Karagozian *v.* USV Optical, Inc.

or unpleasant that a reasonable person in the plaintiff's shoes would have felt compelled to resign.

The following facts and procedural history, as contained in the record and in the Appellate Court's decision, are relevant to this appeal. The plaintiff's complaint alleged that the plaintiff began working in an optical department operated by the defendant and located in a JCPenney store in Trumbull. As a licensed optician manager, the plaintiff's role involved providing optometric assistant services to the doctor of optometry at the store. His specific duties included, but were not limited to, maintaining records, scheduling appointments, preparing patients for vision examinations, adjusting and repairing glasses, modifying contact lenses, measuring intraocular pressure of eyes using a glaucoma test, and measuring the axial length of eyes using ultrasound equipment. About three months into his employment, the plaintiff asked his supervisors that "he not be required to perform such duties . . . ." According to the plaintiff, he made this request on at least three separate occasions on the basis of his belief that these duties violated the public policy of the state of Connecticut.

As support for his belief that these duties violated the state's public policy, the plaintiff attached to his complaint copies of a declaratory ruling issued by the Board of Examiners for Optometrists on May 1, 2002, and a cease and desist consent order issued by the Board of Examiners for Optometrists and the Board of Examiners for Opticians in February, 2006. In the plaintiff's view, the declaratory ruling "prohibits employees under the control of unlicensed third parties from performing services for licensed optometrists." The cease and desist consent order, the plaintiff alleged, provided that Walmart, Inc., had agreed not to permit licensed opticians to perform the duties of an optometric assistant or to perform services for optometrists by whom

Karagozian *v.* USV Optical, Inc.

they were not employed. Additionally, the plaintiff alleged that his duties violated public policy, as set forth in General Statutes § 31-130 (i),[3] in that "neither the defendant nor JCPenney had a staffing permit allowing either of them to provide staffing services to the doctor." The plaintiff's complaint alleged that the defendant refused the plaintiff's requests and failed to excuse him from these duties. As a result, the plaintiff claimed, he was compelled to resign his position. He then brought this action for constructive discharge.

The defendant moved to strike the complaint on the ground that the plaintiff's allegations did not, as a matter of law, satisfy the requirements of a constructive discharge claim. Specifically, the defendant argued, the documents on which the plaintiff relied—the declaratory ruling and the cease and desist consent order— were not binding on the parties in the present case and did not create a private right of action for optometric assistants. The defendant also contended that the plaintiff's reliance on § 31-130 (i) was misplaced because his complaint made no allegation that optometrists employed by the defendant charged the defendant for hiring opticians. As to the elements of a constructive discharge claim, the defendant argued that the plaintiff's complaint failed to establish that the employer intentionally created an intolerable work atmosphere that forced the plaintiff to quit.

The trial court agreed with the defendant and granted the motion to strike the complaint. The plaintiff declined to replead and, instead, after the court rendered judg-

---

[3] General Statutes § 31-130 (i) provides in relevant part: "No person shall engage in the business of procuring or offering to procure employees for persons seeking the services of employees or supplying employees to render services where a fee or other valuable thing is exacted, charged or received from the employer for procuring or assisting to procure or supplying such employees unless he registers with the Labor Commissioner. . . ."

Karagozian *v.* USV Optical, Inc.

ment in favor of the defendant, appealed to the Appellate Court, which affirmed the judgment of the trial court. The Appellate Court's decision relied on its interpretation of the standard we established in *Brittell* for a constructive discharge claim. The plaintiff then petitioned this court for certification to appeal, which we granted on one issue: "Did the Appellate Court correctly construe and apply *Brittell* v. *Dept. of Correction,* [supra, 247 Conn. 148], in holding that an action for constructive discharge in violation of public policy requires that the plaintiff allege and prove not only that the employer intended to create an intolerable work atmosphere but that the employer intended thereby to force the plaintiff to resign?" *Karagozian* v. *USV Optical, Inc.,* 331 Conn. 904, 201 A.3d 1023 (2019).

On appeal to this court, the plaintiff reasserts his position that a constructive discharge allegation should not focus on the "employer's state of mind but on the objective reality of the working conditions and the impact of that objective reality, not upon the particular worker in question, but upon a hypothetical reasonable person in the worker's position. . . . By requiring the employee to prove . . . that the employer intended to force him to resign, the Appellate Court . . . imposed a requirement that defeats the very purpose of the constructive discharge doctrine." (Citations omitted; emphasis omitted.) Accordingly, the plaintiff urges this court to reverse the Appellate Court's judgment upholding the trial court's decision to strike his complaint.

I

"Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling . . . is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favor-

Karagozian *v.* USV Optical, Inc.

able to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied.'' (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 398, 142 A.3d 227 (2016).

To evaluate whether the Appellate Court properly upheld the trial court's ruling that the plaintiff failed to allege facts sufficient to support a claim for constructive discharge, we first must determine whether the Appellate Court properly applied the constructive discharge standard that we described in *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 148: ''Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily. . . . Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'' (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 178, quoting *Chertkova* v. *Connecticut General Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996).

The parties in the present case disagree in their interpretation of the *Brittell* standard, specifically as to the element of intent. The defendant candidly suggests that two different interpretations of the standard are plausible—either that the employer intended to create an intolerable work atmosphere or that the employer intended to create the intolerable work atmosphere and thereby intended to force the employee to quit. The defendant argues that a plaintiff claiming that he was constructively discharged should be required to show that the employer intended to force the employee to resign. As support for its claim, the defendant points to Appellate Court and Superior Court cases that ''have consistently applied *Brittell* to require that the employer intend to

Karagozian *v.* USV Optical, Inc.

force the employee to resign.''[4] According to the defendant, the Appellate Court in the present case correctly applied the standard in concluding that the plaintiff had failed to assert facts showing that the defendant intended to force his resignation.

The plaintiff, on the other hand, asserts that the proper interpretation of *Brittell* is that an employer's intent matters only in regard to the creation of the intolerable work atmosphere. He argues that the Appellate Court incorrectly interpreted the standard in *Brittell* by forcing him to show that the employer intended to force him to resign.

We agree with the plaintiff. An examination of our decision in *Brittell* reveals that we required that the plaintiff establish only that the employer intended to create the intolerable work atmosphere, not that the

---

[4] For example, the defendant relies on *Boucher* v. *Saint Francis GI Endoscopy, LLC*, 187 Conn. App. 422, 202 A.3d 1056, cert. denied, 331 Conn. 905, 201 A.3d 1023 (2019), in which the Appellate Court, interpreting *Brittell*, stated that ''the plaintiff has presented no evidence from which it can be inferred that the defendant deliberately sought to force the plaintiff to quit.'' Id., 433; see also *Horvath* v. *Hartford*, 178 Conn. App. 504, 510–11, 176 A.3d 592 (2017) (''to meet the high standard applicable to a claim of constructive discharge, a plaintiff is required to show . . . that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign''). In fact, the Appellate Court panel in the present case was following *Horvath*. See *Karagozian* v. *USV Optical, Inc.*, supra, 186 Conn. App. 873 n.15.

The defendant also relies on a Superior Court case in which the court set out the standard for a constructive discharge claim as follows: ''To plead a prima facie case of constructive discharge, a plaintiff must allege two elements. First, the plaintiff must show that the defendant acted deliberately to create an intolerable work environment. Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit . . . .'' *Harrelle* v. *Wendy's Old Fashioned Hamburgers of New York, Inc.*, Docket No. CV-14-6008428-S, 2017 WL 715754, *7 (Conn. Super. January 10, 2017). Applying that standard, the court found that a genuine issue of material fact existed as to whether the employer transferred the employee ''for legitimate business reasons or to force the [employee] to quit.'' Id., *8. In light of our holding today, to the extent that those cases incorrectly applied the *Brittell* standard, we disavow that application.

Karagozian *v.* USV Optical, Inc.

employer intended to compel the plaintiff to quit. Recent United States Supreme Court precedent, applying federal law on which we relied in *Brittell*, supports our determination.

In *Brittell*, about one year into her employment, the plaintiff, a female correction officer employed by the Department of Correction (department) and assigned to one of its correctional centers, reported to her supervisors several incidents of inmates making obscene comments about her sexuality. *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 150–51. On the basis of one of the plaintiff's reports, the deputy warden met with her and thereafter issued a memorandum to the warden, noting "that all staff had been admonished regarding . . . possible consequences of any harassing statements or actions made to or about fellow staff [persons] . . . that he had advised the plaintiff to report any continued harassing behavior to her supervisors . . . and report[ing] that the plaintiff had declined the help of the employee assistance program . . . ." (Footnotes omitted.) Id., 153.

About seven months later, another incident occurred. Id., 154. The plaintiff reported the matter to a major, who "issued a notice to all employees that defined sexual harassment . . . . A similar notice was read at roll call for seven consecutive days." Id. The plaintiff then filed a written complaint with the warden and informed the major that she had sought psychiatric help. Id., 155. The major thereafter informed her that she should not return to work, and she was placed on medical leave. Id., 157. The plaintiff also contacted the department's affirmative action unit and filed a formal complaint. Id., 158. The affirmative action unit "offered to recommend a transfer for the plaintiff to any institution of her choice within the department . . . . The plaintiff, however, was not amenable to this suggestion." Id., 159. The plaintiff declined the idea of a transfer on three other

Karagozian *v.* USV Optical, Inc.

occasions: (1) at the suggestion of the affirmative action unit, stating as reasons that she had a new apartment, she did not have a car, and her mother lived nearby; (2) at the suggestion of an employee in the department's personnel department, citing as reasons certain medical problems and that she did not own a car; and (3) at the suggestion of the warden, voicing concern over the possibility that correction officers and inmates from the correctional facility also might be transferred to the same institution, which could lead to a recurrence of the rumors. Id., 159–60. The plaintiff applied for medical leave and continued on unpaid medical leave until she failed to submit necessary medical documentation. Id., 160–61. At that point, her employer considered her to have resigned. Id., 161.

The plaintiff thereafter brought an action in which she alleged that she had been constructively discharged "because the working conditions that she faced became so difficult that a reasonable person similarly situated would have felt compelled to leave . . . ." Id., 162. The trial court, after a court trial, rejected her constructive discharge claim "on the ground that the defendant had offered the plaintiff the opportunity to transfer to any one of a number of other correctional institutions within the general vicinity of her home, but the plaintiff had declined these offers." Id., 163. On appeal to this court, the plaintiff claimed that, "by failing to put an end to the harassment she faced at work for nearly two years, [the department] created a work environment so hostile that any reasonable person in her position would have left." Id., 178. This court, for the first time, set forth the now oft quoted standard for constructive discharge: "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily. . . . Working conditions are intolerable if they are so diffi-

Karagozian *v.* USV Optical, Inc.

cult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'' (Citations omitted; emphasis in original; internal quotation marks omitted.) Id. This quoted language came word for word from a then recent case from the United States Court of Appeals for the Second Circuit, with only one difference—we italicized the word ''intentionally.'' See *Chertkova* v. *Connecticut General Life Ins. Co.*, supra, 92 F.3d 89 (concluding that plaintiff met burden of establishing prima facie case of constructive discharge due to harassment on basis of gender under Title VII of Civil Rights Act of 1964, as amended by Title VII of Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq.).[5]

In the context of the facts in *Brittell*, our emphasis on intent makes sense. The plaintiff in *Brittell* had claimed that the department's failure to remedy the hostile work environment equated to its intentionally having created the work environment of which she complained. See *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 178. Contrary to her argument, the trial court found that the facts supported the department's argument that it had in fact made efforts to remedy the situation and to provide the plaintiff with alternatives. For example, the employer on several occasions offered to transfer the plaintiff to the location of her choice. Id., 159–60. We specifically stated: ''Even if we assume, arguendo, that an employer's failure to remedy a hostile working environment may be considered the intentional creation of an intolerable work atmosphere . . . the plaintiff has not met her burden of establishing an essential element of her claim, namely, the existence of an intolerable work atmosphere that would compel a rea-

_____

[5] ''We look to federal law for guidance in interpreting state employment discrimination law, and analyze claims under [the Connecticut Fair Employment Practices Act, General Statutes § 46a-51 et seq., the state counterpart to Title VII] in the same manner as federal courts evaluate federal discrimination claims.'' (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 636 n.11, 79 A.3d 60 (2013).

Karagozian *v.* USV Optical, Inc.

sonable person in that situation to resign. Had the plaintiff established that she was given the choice either to continue working with the officers and inmate population at the correctional center or to leave the employ of the defendant, she might well have prevailed on this element of her claim." (Citation omitted; emphasis omitted.) Id., 179.

Said another way, if the department had intentionally created the intolerable work atmosphere by refusing to address the issue, refusing to make any alteration in the plaintiff's work conditions, or refusing to offer her any relief (i.e., by forcing her to remain at the correctional facility or to quit), the plaintiff could have succeeded on her constructive discharge claim. The trial court in *Brittell* found that the opposite was true. In fact, the department *intentionally* attempted to improve the work atmosphere for the plaintiff by giving her the choice of transferring to another correctional institution, away from the correction officers and inmates who had made the work atmosphere intolerable. In light of our analysis of the facts in *Brittell*, it is clear that our emphasis of the word "intentionally" within the quotation from *Chertkova* v. *Connecticut General Life Ins. Co.*, supra, 92 F.3d 89, manifested an intent that "intentionally" modify the requirement that the employer created the complained of environment. Notably, by contrast, nowhere in *Brittell* did we require or allude to a requirement that the plaintiff establish that the department had intended to force her to quit.

To clarify the intent element of a constructive discharge claim for future cases, the phrase under examination—"[c]onstructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily"—should be understood to refer to the employer's intent to create the intolerable work atmosphere itself.

Karagozian *v.* USV Optical, Inc.

Thus, to plead a prima facie case of constructive discharge, a plaintiff must allege that (1) the employer intentionally created the complained of work atmosphere, (2) the work atmosphere was so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (3) the plaintiff in fact resigned. This standard does not require that the plaintiff allege facts to show that the employer intended to force the employee to resign, only that a reasonable employee would feel compelled to resign. See *Petrosino* v. *Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004) (stating that Second Circuit "has not expressly insisted on proof of specific intent," although in some constructive discharge cases, "where such evidence exists, the mens rea requirement is easily established").

In addition to being consistent with *Brittell* itself, recent United States Supreme Court precedent regarding constructive discharge does not dissuade us, as the plaintiff and the amicus argue, from our interpretation of the intent element. In *Green* v. *Brennan*,      U.S.     , 136 S. Ct. 1769, 195 L. Ed. 2d 44 (2016), the court explained: "The whole point of allowing an employee to claim 'constructive' discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him. . . . We do not also require an employee to come forward with proof—proof that would often be difficult to allege plausibly—that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's intent all along." (Citation omitted; footnote omitted.) Id., 1779–80, citing *Pennsylvania State Police* v. *Suders*, 542 U.S. 129, 141–43, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).

Quoting the same language, the Commission on Human Rights and Opportunities (commission) filed an amicus brief in the present case, positing that we should

Karagozian *v.* USV Optical, Inc.

eliminate the element of intent altogether and adopt a completely objective standard. We do not agree with the commission that the court in *Green* completely eliminated the element of intent for a constructive discharge claim. A constructive discharge claim under Title VII requires a plaintiff to prove discrimination by an employer—inherently necessitating proof of an element of intent in creating the workplace condition. See *Pennsylvania State Police* v. *Suders*, supra, 542 U.S. 133 ("[t]o establish [a] hostile work environment [under Title VII], plaintiffs like Suders must show harassing behavior sufficiently severe or pervasive to alter the conditions of [their] employment" (internal quotation marks omitted)).

In *Green*, the plaintiff alleged that he was denied a promotion because of race and alleged that his supervisors threatened to bring criminal charges against him in retaliation for his complaint, thereby forcing his resignation in violation of Title VII. *Green* v. *Brennan*, supra, 136 S. Ct. 1774–75. The case turned on the question of whether the forty-five day limitation period for a constructive discharge claim by a federal civil servant begins to run after the last discriminatory act or when the employee resigns. Id.; see 29 C.F.R. § 1614.105 (a) (1) (2012) (federal civil servants, prior to filing complaint, were required to initiate contact with counselor at their agency within forty days of date of matter alleged to be discriminatory). To answer the question, the court set out the basic elements of a constructive discharge claim. "A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign . . . [and] he must also show that he actually resigned." (Citation omitted.) *Green* v. *Brennan*, supra, 1777. On the basis of, in part, the fact that a constructive discharge claim requires that the employee actually resign, the court concluded that the

442 OCTOBER, 2020 335 Conn. 426

Karagozian *v.* USV Optical, Inc.

limitation period should begin to run when the employee resigns. Id., 1776–77.

In a concurring opinion, Justice Alito stated that the majority ignored a bedrock principle of Title VII cases: "An act done with discriminatory intent must have occurred within the [limitation] period." Id., 1782 (Alito, J., concurring in the judgment). In accordance with this principle, Justice Alito concluded, an employee's resignation triggers a fresh [limitation] period when "the employer makes conditions intolerable *with the specific discriminatory intent of forcing the employee to resign*." (Emphasis in original.) Id., 1785 (Alito, J., concurring in the judgment). However, "[i]f the employer lacks that intent . . . the [limitation] period [should run] from the discriminatory act that precipitated the resignation." Id. The majority responded: "This sometimes-a-claim-sometimes-not theory of constructive discharge is novel and contrary to the constructive discharge doctrine. . . . We do not . . . require an employee to [prove] . . . that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along." (Citation omitted; footnote omitted.) Id., 1779–80. The majority rejected requiring that a plaintiff alleging constructive discharge prove specifically that the employer intended to force the employee to resign. See id. The court did not reject the requirement that a plaintiff prove some kind of discrimination, however. Rather, the required discrimination speaks to the first requirement under our standard in *Brittell*—the employer's intent in creating the work condition of which the plaintiff complains. In *Green*, the employer created the complained of condition by promising not to pursue criminal charges against the plaintiff in exchange for his promise to retire or take a position with a considerably lower salary, thereby forcing him to involuntarily resign. Id., 1783.

Karagozian *v.* USV Optical, Inc.

The constructive discharge requirements in *Green* are not purely objective and align with the standard we established in *Brittell.* If not made perfectly clear in that case, we are now afforded an opportunity to clarify that standard in the present case.[6] The standard contains a subjective inquiry (did the employer intend to create the working condition) and an objective inquiry (the impact the working conditions would have on a reasonable person). To evaluate the working conditions, we evaluate whether a reasonable person in the employee's shoes would have felt compelled to resign. The defendant in the present case argues that the standard should go one step further. It contends that the plaintiff must show that the defendant in fact subjectively intended that a specific employee resign under conditions deemed intolerable by an objectively reasonable person. That kind of showing would be difficult to allege and inconsistent with the aims of the objective requirement. We decline the defendant's request to require that a constructive discharge claim allege facts establishing that the employer intended for the employee to resign.

II

Having set forth the requirements to establish a prima facie case for constructive discharge, we turn to the Appellate Court's analysis in the present case and consider whether the Appellate Court properly upheld the

---

[6] Although the plaintiff in the present case did not allege a Title VII violation, we perceive no justification for altering the requirements for a constructive discharge claim depending on whether the claim is one for a constructive discharge resulting from race discrimination; *Grey* v. *Norwalk Board of Education*, 304 F. Supp. 2d 314, 320–21 (D. Conn. 2004); gender discrimination; *Usherenko* v. *Bertucci's Corp.*, Docket No. 3:05-CV-756 (JCH), 2006 WL 3791389, *1 (D. Conn. December 21, 2006); a sexually hostile work environment; *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 150; whistleblowing activities; *Horvath* v. *Hartford*, 178 Conn. App. 504, 506, 176 A.3d 592 (2017); or any other intentionally created circumstance resulting in work conditions that would compel a reasonable person to resign.

Karagozian *v.* USV Optical, Inc.

trial court's granting of the defendant's motion to strike the complaint in its entirety.

Although the Appellate Court quoted the proper standard for a constructive discharge claim, we conclude that the court incorrectly applied the standard. In applying the standard, the Appellate Court upheld the trial court's judgment on the basis of, in part, the plaintiff's failure to allege facts that the defendant intended to force him to quit. See *Karagozian* v. *USV Optical, Inc.*, supra, 186 Conn. App. 867–68. Specifically, the Appellate Court stated: ''The plaintiff denies the plain language of *Brittell*, arguing that a more sensible reading of *Brittell* would [lead to the conclusion] that it is the employer's intent to create the work atmosphere in question that matters, rather than an intent that such atmosphere should force an employee to resign.'' Id., 868. On this point, we conclude that the Appellate Court incorrectly applied *Brittell*, and we reiterate that *Brittell* requires only that plaintiffs allege facts showing that the employer intended to create the conditions of which a plaintiff complains. See part I of this opinion.

On an alternative ground, the Appellate Court upheld the trial court's striking of the plaintiff's complaint, reasoning that the plaintiff had failed to satisfy the second requirement of a constructive discharge claim— he failed to allege facts establishing that the work atmosphere was so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign. *Karagozian* v. *USV Optical, Inc.*, supra, 186 Conn. App. 870. We agree. Even when the allegations of the complaint are construed in the light most favorable to sustaining the complaint, we conclude that the plaintiff's allegations do not meet this standard.

In support of his allegation of intolerable work conditions, the plaintiff relied on the declaratory ruling issued by the Board of Examiners for Optometrists, the cease

Karagozian *v.* USV Optical, Inc.

and desist consent order issued by the Board of Examiners for Optometrists and the Board of Examiners for Opticians, and § 31-130 (i). In his brief to this court, he explained: "No employer may require its employees to violate the law. A reasonable employee, having been instructed to do so, would refuse and resign. The employer is responsible for that resignation, since the sole proximate cause of the resignation was the employer's illegal job requirement." Contrary to the plaintiff's assertion, however, nothing in his complaint establishes that the defendant required him to violate the law. The declaratory ruling evaluated the circumstances under which an optometrist would be considered an employee, and not an independent contractor, of an unlicensed person, firm, or organization so as to comply with General Statutes § 20-133a.[7] We agree with the defendant that the plaintiff cannot rely on the declaratory ruling because the ruling itself provides that it is only "binding upon those who participate[d] in the hearing" that resulted in the ruling. The plaintiff did not participate in the hearing. Moreover, the ruling concerned optometrists. Even if we were to credit the plaintiff's argument that the ruling established a public policy regarding optometrists, the plaintiff's tasks could not have violated that particular policy because he was employed as an optician, not an optometrist. Furthermore, the ruling "[was] intended to provide guidance" to individual licensed optometrists. It did not establish criminal liability or inflict repercussions or potential sanctions for any specific conduct that would compel a reasonable optician in the plaintiff's shoes to resign. See *Sheets*

---

[7] General Statutes § 20-133a provides in relevant part: "No licensed optometrist shall practice his profession as an employee of any unlicensed person, firm or corporation, provided that said prohibition shall not apply to health service organizations, hospitals, other optometrists or ophthalmologists. . . . No rule of the board shall prohibit the practice of optometry on a lessee or sublessee basis in or on the premises of a retail, commercial or mercantile establishment."

v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 480, 427 A.2d 385 (1980) ("an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment").

Similarly, the plaintiff's complaint failed to show how the cease and desist consent order either applied to the plaintiff or bound the defendant. The order required that Walmart, Inc., not permit a licensed optician to act in the capacity of an optometric assistant to an independent optometrist leasing space in a store owned by Walmart, Inc. We fail to see, because the plaintiff failed to allege, how the cease and desist consent order functionally created a working condition so intolerable that a person in his shoes would have been justified in walking off the job as if they had been fired. We also fail to understand how the defendant—which was not a party to the cease and desist consent order—could be bound by Walmart, Inc.'s agreement that, without admitting any fault, it would change its employment practices.

The statute the plaintiff relies on is also inapplicable. Section 31-130 (i) requires that persons engaged in the business of procuring or offering to procure employees for employers must register with the Commissioner of Labor before they may charge employers for their services. The plaintiff did not allege that the doctor of optometry charged a fee from the defendant for hiring the plaintiff as an assistant. Accordingly, the statute does not implicate the defendant.

Finally, we are not persuaded that the plaintiff's allegations suggest that the defendant intended to create conditions different from what the plaintiff would have expected when he agreed to work as a licensed optician manager at the defendant's operation. The plaintiff's complaint centered around the duties he was in fact hired to perform, not some intolerable work atmo-

Karagozian *v.* USV Optical, Inc.

sphere that forced him to quit involuntarily. The defendant contends that the plaintiff's allegations included that "he was asked to provide optometric assistant services to the on-site doctor of optometry *from day one.* It defies logic to conclude that, from the very first day of [the] plaintiff's employment, [the defendant] had intended to force [the] plaintiff to quit involuntarily.'' (Emphasis in original.) We agree with the defendant.

The complaint does not allege that any of the plaintiff's assigned tasks changed between his hire date in June, 2014, and September, 2014, when he first complained to his supervisors. All we know from the complaint is that the plaintiff began working for the defendant in June, 2014, and that the defendant required him to perform the tasks he complains of from "approximately June 28, 2014, to approximately October 17, 2014 . . . .'' The complaint does not allege that the plaintiff was unaware of the duties he would be required to perform or that the defendant changed his responsibilities after he was hired. Nor does the complaint suggest that anything changed from what he agreed to perform within the scope of his employment and what he now asserts violates public policy. "In general . . . an employee's dissatisfaction with his job responsibilities and assignments do not suffice to establish a claim of constructive discharge.'' *Zephyr* v. *Ortho McNeil Pharmaceutical*, 62 F. Supp. 2d 599, 608 (D. Conn. 1999) (finding that plaintiff failed to establish that he was constructively discharged).

By failing to establish that his work conditions were so intolerable that a reasonable person in the plaintiff's shoes would have felt compelled to resign, the plaintiff's complaint fails. The Appellate Court correctly upheld the trial court's striking of the plaintiff's complaint in its entirety.

448 OCTOBER, 2020 335 Conn. 426

Karagozian *v.* USV Optical, Inc.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.